754 F.2d 1072
 11 Media L. Rep. 1577
 MARCONE, Frank J., Appellee,
v.
PENTHOUSE INTERNATIONAL MAGAZINE FOR MEN and Penthouse
International Ltd. and Meredith Printing Corp. and
Curtis Circulation Company and Rasen, Edward,
Penthouse International, Ltd., Appellant.
 No. 84-1004.
 United States Court of Appeals, Third Circuit.
 Argued July 20, 1984.
Decided Feb. 6, 1985.
 
 John A. Luchsinger, (argued), Luchsinger, Murphy & Noel, Media, Pa., for appellee.
 Norman Roy Grutman, (argued) Jeffrey H. Daichman, Grutman Miller Greenspoon & Hendler, New York City, Gregory S. Rubin, Rubin & Associates, Paoli, Pa., for appellant.
 Before ADAMS, HIGGINBOTHAM, and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Once again this Court is called upon to chart the proper course between the Scylla of inadequately guaranteeing First Amendment protections and the Charybdis of diminishing an individual's right to reputation. Plaintiff Frank Marcone brought suit for libel against Penthouse, the International Magazine for Men and Penthouse International, Ltd. (collectively Penthouse). The district judge determined that Marcone was not a public figure and therefore charged the jury that it could award him compensatory damages upon a showing that the publisher was negligent. The jury awarded Marcone compensatory as well as punitive damages. Because the district judge erred in not classifying Marcone as a limited purpose public figure and because plaintiff failed to prove that the libelous statement was made with actual malice, the standard prescribed in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), we will reverse.
 
 I.
 
 2
 Marcone is an attorney residing in Delaware County, a suburb of Philadelphia. During the mid-1970's he gained notoriety in part through his representation of the Pagans, a motorcycle gang headquartered in Marcus Hook, Pennsylvania, and a rival gang, the Warlocks. Marcone was also linked to these motorcycle gangs on a non-professional basis. In this regard, law enforcement agents stated that Marcone frequented "the Castle," a 40-room mansion in Delaware County which served as the Pagans' headquarters. Among other things, the Castle was connected with the disappearance and death of five young women in 1976. An article in the Philadelphia Inquirer dated March 18, 1976, reported that Marcone once stated that he "occasionally went on weekend trips" with one of the motorcycle gangs. App. at 198a(5).
 
 
 3
 In February of 1976, a grand jury in Detroit, Michigan, handed down an indictment charging Marcone and 24 other co-defendants with conspiring "to knowingly, intentionally and unlawfully possess with intent to distribute, and to distribute marijuana" in violation of 21 U.S.C. Secs. 841(a)(1), 846 (1982). In particular, the indictment charged that "[d]uring May, 1974, FRANK MARCONE gave $25,000 in United States currency to FREDERICK R. FREY in Philadelphia, Pennsylvania for the purpose of purchasing multi-hundred pound quantities of marijuana in California." Law enforcement agents stated that Marcone and the three other co-defendants from the Philadelphia area had frequent meetings at the Castle.
 
 
 4
 On May 19, 1976, the government withdrew the charges against Marcone without prejudice to his being reindicted in Philadelphia. An assistant United States Attorney in Detroit explained that the charges were dropped because of "legal technicalities" in tying Marcone to the larger conspiracy which involved defendants from San Diego to Montreal. For reasons not explained in the record, Marcone was not subsequently reindicted in Philadelphia.
 
 
 5
 Penthouse published an article in its November 1978 issue entitled "The Stoning of America." Written by Edward Rasen, the article concerned the emergence of marijuana trade as a multibillion dollar industry. The subtitle stated that "marijuana is now big agribusiness--a $12 billion a year corporate growth crop." The article proceeded to report, in part, about "criminal attorneys and attorney criminals" involved in drug transactions:
 
 
 6
 [T]he typical new dope businessman is an attorney. "We have criminal attorneys and attorney criminals," says Fred Rody, Miami DEA regional director. "There is such a thing as criminal consort. We know that some of the large smuggling operations have lawyers who are providing them with all the advice they need to operate."
 
 
 7
 However, even after DEA agents spent more than two years building an airtight case against a Mexican-American syndicate involved in the multi-million-dollar, nationwide wholesaling of marijuana, federal judges did not sentence any of the attorney criminals to prison.
 
 
 8
 Examples: Richard J. Litner, a practicing attorney in Boston, financed sales in New England and set up "cover" corporations, yet was offered the opportunity by federal judge Charles W. Joiner, without the consent of the prosecutor, to plead guilty to reduced charges. He was then placed on one-year probation so that he would not be disbarred and deprived of his livelihood. Attorney John K. Lowe, of Denver and Kansas City, made a hand-to-hand sale of 400 pounds of marijuana to an undercover agent for $40,000. He received two years' probation and a $1,000 fine. As a law student, George Weingarten, now a practicing attorney in San Diego, once received a gold Rolex wristwatch as a sales reward for distributing 10,000 pounds of marijuana in one week. He became a DEA informant in exchange for a reduced sentence of one-year probation. Maria Blanca-Vargas Reid, executive director of the San Diego Mental Health Association, handled a $35,000 drug payment. Charges were dismissed in the interest of justice after she cooperated with federal authorities and revealed the whereabouts of her son, Robert Craig Chipman, and his criminal associates. Frank Marcone, an attorney from the Philadelphia area, contributed down payments of up to $25,000 on grass transactions. Charges against him were dismissed because he cooperated with further investigations. Charles Sargent Hewett, a law student from Corona Del Mar, Calif., wholesaled up to $750,000 of marijuana per week. Charges were dismissed at the request of the U.S. attorney's office for his cooperation in identifying all the people he sold to, even though he was involved in the murder of his former distributor in Boston and the attempted murder of one of his associates from San Francisco. And so on.
 
 
 9
 App. at 21a (emphasis added).
 
 
 10
 Marcone brought suit against Penthouse charging that the article libeled him since it declared that he was guilty of an offense for which he was only indicted, and since it stated that charges were dropped against him because he cooperated with the authorities. Plaintiff alleges that these two statements are untrue and that they have caused him harm and subjected him to ridicule.
 
 
 11
 Penthouse moved for summary judgment on six grounds, including that Marcone was a public figure and was unable to make the showing of actual malice required by New York Times and its progeny. The district court denied the motion, Marcone v. Penthouse International, Ltd., 533 F.Supp. 353 (E.D. Pa.1982), and the case proceeded to trial.
 
 
 12
 Shortly before trial, the district judge ruled that the article was libelous per se; that Marcone was not a public figure; and that Pennsylvania would adopt a negligence standard for private figures regardless of whether the article involved matters of public concern. The case was tried before a jury which returned a verdict for Marcone of $30,000 actual damages and $537,000 punitive damages. The district judge rejected Penthouse's post trial motions for judgment n.o.v. or a new trial, but ordered a remittitur reducing the punitive damages to $200,000 because he found the jury's award to be "so grossly excessive as to shock the conscience of the Court." Marcone v. Penthouse International, Ltd., 577 F.Supp. 318, 335 (E.D. Pa.1983). Marcone accepted the remittitur on December 20, 1983, and Penthouse appealed from the final judgment, which as modified consists of $30,000 in actual damages and $200,000 in punitive damages.
 
 II.
 
 13
 Although replete with First Amendment implications, a defamation suit fundamentally is a state cause of action. The parties here agree that Pennsylvania law applies. Inasmuch as Marcone is a Pennsylvania resident and any harm to his reputation that may have occurred centered in that state, the district court was correct to apply Pennsylvania law. See Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 269-70 (3d Cir.1980); Pierce v. Capital Cities Communications, Inc., 576 F.2d 495, 501-02 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).
 
 
 14
 An adjudication of a defamation case involves both state and federal law inquiries. A court must determine: "(1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery." Steaks Unlimited, 623 F.2d at 270.
 
 
 15
 Thus our initial inquiry is whether plaintiff has made a proper claim under state law. To recover in a libel action under Pennsylvania law, plaintiff has the burden of proving, when properly raised:
 
 
 16
 (1) The defamatory character of the communication.
 
 
 17
 (2) Its publication by the defendant.
 
 
 18
 (3) Its application to the plaintiff.
 
 
 19
 (4) The understanding by the recipient of its defamatory meaning.
 
 
 20
 (5) The understanding by the recipient of its as intended to be applied to the plaintiff.
 
 
 21
 (6) Special harm resulting to the plaintiff from its publication.
 
 
 22
 (7) Abuse of a conditionally privileged occasion.
 
 
 23
 42 Pa. Cons. Stat. Sec. 8343(a) (1982); see also Corabi v. Curtis Publishing Co., 441 Pa. 432, 273 A.2d 899 (1971); Agriss v. Roadway Express, Inc., 483 A.2d 456 (Pa.Super.1984). Penthouse challenges Marcone's claim on several of these grounds.
 
 A.
 
 24
 First, defendant contends that plaintiff has not met the burden of proving the article's defamatory character. This is so, Penthouse maintains, because the questioned remarks are incapable of defamatory meaning. Whether a statement is capable of defamatory meaning is a question the judge, as distinguished from the jury, must determine, see Franklin Music Co. v. American Broadcasting Cos., Inc., 616 F.2d 528, 540 (3d Cir.1979); Corabi, 441 Pa. at 442, 273 A.2d at 904 (1971), and the district court ruled that the article was capable of a defamatory meaning.
 
 
 25
 According to Pennsylvania law, a statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Corabi, 441 Pa. at 442, 273 A.2d at 904 (quoting Cosgrove Studio and Camera Shop, Inc. v. Pane, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962)). The threshold determination of whether a statement is capable of defamatory meaning depends "on the general tendency of the words to have such an effect"; no demonstration of any actual harm to reputation is necessary. Agriss, 483 A.2d at 461.
 
 
 26
 Penthouse attempts to demonstrate that each individual phrase in the article, in isolation, cannot be understood as libelous. Thus, for example, it asserts that "cooperated with further investigations" cannot be defamatory. The proper test, however, requires that the allegedly libelous communication be read as a whole, in context. Corabi, 441 Pa. at 444, 273 A.2d at 906; Agriss, 483 A.2d at 461.
 
 
 27
 As the district court observed, "The Stoning of America" refers to "attorney criminals" and lists as one of the examples:
 
 
 28
 Frank Marcone, an attorney from the Philadelphia area, contributed down payments of up to $25,000 on grass transactions. Charges against him were dismissed because he cooperated with further investigations.
 
 
 29
 This statement suggests that Marcone has committed a crime. Statements imputing the commission of an indictable offense are capable of defamatory meaning as a matter of law. See Baird v. Dun & Bradstreet, 446 Pa. 266, 274, 285 A.2d 166, 171 (1971); see also Agriss, 483 A.2d at 470. Thus Penthouse's argument that the article could not possibly have defamed Marcone is not valid.
 
 B.
 
 30
 Defendants next contend that even if its article was capable of being defamatory, Marcone's reputation in the community was so tarnished before the publication that no further harm could have occurred. Penthouse's assertion is that Marcone was, in effect, libel proof before the publication of the allegedly libelous statement. See Cardillo v. Doubleday & Co., 518 F.2d 638, 639-40 (2d Cir.1975); Sharon v. Time, Inc., 575 F.Supp. 1162, 1168-72 (S.D.N.Y.1983); Wynberg v. National Enquirer, Inc., 564 F.Supp. 924, 927-28 (C.D.Cal.1982).
 
 
 31
 In Wynberg, for example, the court held that a plaintiff, who had a brief but highly publicized romance with Elizabeth Taylor was libel proof. 564 F.Supp. at 928. Wynberg had been convicted of criminal conduct on five separate occasions, including a conviction for contributing to the delinquency of minors. The court concluded thatWhen, for example, an individual engages in conspicuously anti-social or even criminal behavior, which is widely reported to the public, his reputation diminishes proportionately. Depending upon the nature of the conduct, the number of offenses, and the degree and range of publicity received, there comes a time when the individual's reputation for specific conduct, or his general reputation for honesty and fair dealing is sufficiently low in the public's estimation that he can recover only nominal damages for subsequent defamatory statements.
 
 
 32
 Id.
 
 
 33
 To bolster its claim that Marcone is entitled only to nominal damages, Penthouse cites a string of items of negative publicity regarding Marcone, from 1976 onward. For example, his indictment in connection with drug trafficking in 1976 was widely publicized in the Philadelphia-area media. Moreover, a number of newspaper articles linked Marcone to the Castle, a gathering place for motorcycle gangs and a haven for a variety of illegal activities. In addition, in 1978 Marcone was tried for failing to file Federal Income tax returns for 1971 and 1972. Marcone was tried for criminal income tax evasion in 1978, and although the case ended in a hung jury, it was widely reported by the local media. Marcone was also fined at least twice for contempt of court for his failure to appear at scheduled hearings. The second of these contempt convictions occurred in 1979, however, after the Penthouse article was published. Finally, in 1978 Marcone was fined for punching a police officer who had stopped Marcone's car for a traffic violation.
 
 
 34
 While such evidence suggests that Marcone's reputation was sullied before the article was published, we cannot say as a matter of law that Marcone was libel proof. See Buckley v. Littell, 539 F.2d 882, 889 (2d Cir.1976) (libel proof doctrine is narrow), cert. denied, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); Sharon v. Time, 575 F.Supp. at 1169. Evidence of a tarnished reputation is admissible and should be considered as a factor to mitigate the level of compensatory damages. Corabi, 273 A.2d at 920. In the present case, the jury was informed of the evidence regarding Marcone's reputation, and its verdict for compensatory damages may well reflect the diminished status of Marcone in November of 1978.
 
 C.
 
 35
 Penthouse insists that Marcone's suit must be dismissed because he failed to prove any actual economic harm. This argument has both constitutional as well as state law dimensions.
 
 
 36
 In Gertz v. Robert Welch, Inc., 418 U.S. 323, 349-50, 94 S.Ct. 2997, 3011-12, 41 L.Ed.2d 789 (1974), the Supreme Court placed a number of limitations on state tort actions for defamation. One restriction was that plaintiffs may recover compensation for "actual injury" but not presumed or punitive damages unless the heightened New York Times actual malice standard is used. The Court defined actual injury as
 
 
 37
 not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.
 
 
 38
 Gertz, 418 U.S. at 350, 94 S.Ct. at 3012. Thus proof of actual economic loss is not required to recover compensatory damages as a matter of federal constitutional law.
 
 
 39
 Penthouse's assertion regarding the significance of Marcone's failure to prove "special damages" is also not in conflict with Pennsylvania law. The district court held that the article constituted libel per se and thus proof of special damages was not required. 533 F.Supp. at 361.
 
 
 40
 In a recent decision, the Superior Court of Pennsylvania has elucidated the arcane yet still utilized terms libel and slander per se and libel and slander per quod.[1] See Agriss v. Roadway Express, Inc., 483 A.2d 456, 468-74 (Pa.Super.1984). In Agriss, the Superior Court reasserted the traditional rule under Pennsylvania law that a plaintiff may recover in a libel suit without proving special damages. Id. at 474. Thus Marcone need not have established any actual pecuniary harm.[2] Under Pennsylvania law Marcone was entitled to recover for injury to his reputation as well as for personal humiliation and mental anguish as long as he presented competent evidence of such harm. Corabi, 273 A.2d at 919-20; Montgomery v. Dennison, 363 Pa. 255, 267-68, 69 A.2d 520, 527 (1949).
 
 
 41
 Marcone testified that he was "frustrated, distraught, upset, and distressed about the article and its effect on his family and friends, in that it revived the charges which he thought had been laid to rest two years previously." Marcone, 577 F.Supp. at 333. He also stated that he feared "retribution against his family by clients who imagined themselves the victims of his alleged cooperation" with the government. Id. While Marcone's testimony contained some inconsistencies, it was possible for the jury to assess his credibility and determine whether he actually suffered any harm. Consequently, the evidence of harm to reputation and mental anguish, while not overwhelming, was sufficient under Pennsylvania law to permit recovery for Marcone's "actual damages" as defined in Gertz.
 
 III.
 
 42
 Penthouse next argues that because Marcone was a public figure the district court erred in applying a negligence rather than an actual malice standard to prove liability for actual damages. The Supreme Court has mandated that in order for public officials or public figures to recover damages in a defamation case, they must prove that the statement was published with "actual malice." See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
 
 A.
 
 43
 Prior to 1964, the law of defamation was not viewed as falling within the ambit of the First Amendment, and thus was primarily left to state law. Emphasizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," the Supreme Court, in the landmark decision of New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964), extended First Amendment coverage to defamation concerning the conduct of public officials. The Court granted First Amendment protection to negligently false statements in order to afford the media the "breathing space" necessary to avoid a chilling effect on constitutionally valuable speech, a matter of critical importance to our democratic system. Id. at 271-72, 84 S.Ct. at 721-22 (quoting NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)).[3] Therefore the Court required public officials who sue for defamation to prove that an allegedly defamatory statement was made with " 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-80, 84 S.Ct. at 725-26.
 
 
 44
 Three years later, the Supreme Court extended the actual malice standard for public officials to "public figures" in the companion cases of Curtis Publishing Co. v. Butts and Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Together, these opinions attempted to strike a proper balance between the First Amendment concerns for open debate on public issues and the need of an individual to protect his reputation. See also Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).
 
 
 45
 In Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296 (1971), a plurality opinion of a fragmented Supreme Court extended the New York Times actual malice standard to all "matters of public or general concern." This zenith of First Amendment protection proved transitory, however, and after three years the Court rejected Rosenbloom's issue-oriented approach to defamation cases. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Instead, the Court focused on the private or public status of the plaintiff as the determinative factor in striking the proper balance between individual reputation, freedom of the press, and robust public debate. The actual malice standard still governed for public officials and public figures, but not for private figures. Id. at 347, 94 S.Ct. at 3010.
 
 
 46
 Gertz justified the distinction between public and private figures on two grounds. First, public officials and public figures have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." Id. at 344, 94 S.Ct. at 3009. Because private individuals have less access to effective self help, such individuals are more vulnerable to injury and the state has a correspondingly greater interest in protecting them.
 
 
 47
 More importantly, the Court in Gertz stated that individuals who seek public office or who are public figures have assumed the risk that in the course of reporting and commenting on a well known person or public controversy, the press may inadvertently make erroneous statements about them. Thus those individuals are less deserving of protection. See id. at 344-45, 94 S.Ct. at 3009-10; see also Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 164, 99 S.Ct. 2701, 2705, 61 L.Ed.2d 450 (1979).
 
 
 48
 In considering a defamation case after Gertz, a court is required to ascertain in the first instance whether the plaintiff is a public figure.[4] Public officials and public figures must prove actual malice. Regarding private figures, however, the Court held that states could define the appropriate standard for liability, "so long as they do not impose liability without fault." Gertz, 418 U.S. at 347, 94 S.Ct. at 3010.
 
 
 49
 The Supreme Court has not provided a detailed chart of the contours of the public and private figure categories. In an attempt to avoid "unpredictable results and uncertain expectations," the Court elected to paint with a broad brush rather than to adopt a case by case approach. Gertz, 418 U.S. at 343-44, 94 S.Ct. at 3008-09. Without a precise diagram for guidance, courts and commentators have had considerable difficulty in determining the proper scope of the public figure doctrine.[5] One district court opined that the task of demarcating between public and private figures "is much like trying to nail a jelly fish to the wall." Rosanova v. Playboy Enterprises, Inc., 411 F.Supp. 440, 443 (S.D.Ga.1976), aff'd, 580 F.2d 859 (5th Cir.1978).
 
 
 50
 In Gertz, the Court described two classes of public figures: all purpose public figures and limited purpose public figures. Some individuals "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." 418 U.S. at 345, 94 S.Ct. at 3009. The Court further stated that such a person achieves "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." Id. at 351, 94 S.Ct. at 3013.[6]
 
 
 51
 More common are individuals deemed public figures only in the context of a particular public dispute. These limited purpose public figures become involved in particular public controversies. Id. at 345, 94 S.Ct. at 3009. As the Court explained, a limited purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id. at 351, 94 S.Ct. at 3013.
 
 B.
 
 52
 Penthouse does not contend and we cannot hold that Marcone developed such pervasive notoriety in the community that he should be deemed a public figure for all purposes. See Gertz, 418 U.S. at 352, 94 S.Ct. at 3013 ("Absent clear evidence of general fame or notoriety .... It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."). Rather, the defendant maintains that the trial judge erred in not classifying Marcone as a public figure in the limited circumstance of his connection with illicit drug activities. To determine whether Marcone was a limited purpose public figure with regard to his alleged involvement in the purchase and sale of illicit drugs, we must consider (1) whether drug trafficking is a "public controversy" and (2) the "nature and extent" of Marcone's participation in this controversy. See id.; Avins v. White, 627 F.2d 637, 647 (3d Cir.), cert. denied, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980).
 
 
 53
 In Time, Inc. v. Firestone, 424 U.S. 448, 458, 96 S.Ct. 958, 967, 47 L.Ed.2d 154 (1976), the Supreme Court rejected the equation of "public controversy" with all disputes of interest to the public. Although the Firestones' marital difficulties were the subject of extensive media coverage and public interest, the Court characterized the matter as private in nature. Mere newsworthiness, it stated, is not sufficient to create a public controversy. See Wolston v. Readers Digest, 443 U.S. at 167-68, 99 S.Ct. at 2707-08. In Avins v. White, 627 F.2d at 647, we cited with approval the District of Columbia Circuit's definition that a public controversy "must be a real dispute, the outcome of which affects the general public or some segment of it." Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). To be "public," the dispute must affect more than its immediate participants.[7]
 
 
 54
 Employing this definition, it is clear that the present case involves a public controversy. The challenged statement asserts that Marcone purchased $25,000 worth of marijuana as part of a drug smuggling ring. In fact, Marcone, along with 24 other co-defendants, was indicted for conspiracy and other charges in a nationwide drug trafficking operation which sold an estimated 15,000 tons of marijuana, reputedly worth up to two billion dollars, between 1972 and 1974. At the time of the indictment, law enforcement authorities noted that the ring was the largest drug smuggling operation ever uncovered in the United States. Drug trafficking of such mammoth proportions, which is one of the most troubling issues of our time, surely falls within the ambit of public controversy.[8]
 
 
 55
 Since it is clear that the alleged libel involves a public controversy, it is necessary to examine the nature and extent of Marcone's participation in it. In general, to be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute. From the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labelling the person a public figure. In the typical limited purpose public figure case, the plaintiff actively participates in the public issue in a manner intended to obtain attention. For example, a meat producer that aggressively advertised its product in the media becomes a limited purpose public figure for comment on the quality of its product. See Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 273-74 (3d Cir.1980). Similarly, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. Woy v. Turner, 573 F.Supp. 35 (N.D.Ga.1983).
 
 
 56
 In other defamation cases, the plaintiff's action may itself invite comment and attention, and even though he does not directly try or even want to attract the public's attention, he is deemed to have assumed the risk of such attention. See, e.g., Rosanova v. Playboy Enterprises, Inc., 411 F.Supp. 440 (S.D.Ga.1976), aff'd, 580 F.2d 859 (5th Cir.1978); see also Smolla, supra note 8, at 68-71 (citing numerous examples of individuals deemed public figures).
 
 
 57
 Somewhat related, courts have classified some people as limited purpose public figures because of their status, position or associations. For example, sports figures are generally considered public figures because of their position as athletes or coaches. See, e.g., Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir.1979) (en banc); Barry v. Time, Inc., 584 F.Supp. 1110, 1113 (N.D.Cal.1984). If a position itself is so prominent that its occupant unavoidably enters the limelight, then a person who voluntarily assumes such a position may be presumed to have accepted public figure status. The district court in Chuy stated
 
 
 58
 Where a person has, however, chosen to engage in a profession which draws him regularly into regional and national view and leads to "fame and notoriety in the community," even if he has no ideological thesis to promulgate, he invites general public discussion .... If society chooses to direct massive public attention to a particular sphere of activity, those who enter that sphere inviting such attention must overcome the Times standard .... This is especially so in this case where the subject matter pertained to Donald Chuy's ability to continue playing professional football, a matter in which the sports loving public had a not insignificant interest.
 
 
 59
 Chuy v. Philadelphia Eagles Football Club, 431 F.Supp. 254, 267 (E.D.Pa.1977), aff'd, 595 F.2d 1265 (3d Cir.1979) (en banc).
 
 
 60
 In addition to sports figures, others have been classified as limited purpose public figures by virtue of their associations or positions. For example, the Fifth Circuit deemed Louis Rosanova, a reputed underworld personality, a public figure in the context of his connection to organized crime. Rosanova v. Playboy Enterprises, Inc., 411 F.Supp. 440 (S.D.Ga.1976), aff'd, 580 F.2d 859 (5th Cir.1978). Although never convicted of a crime, Rosanova had been the subject of governmental investigations and criminal prosecutions. 411 F.Supp. at 444. Moreover, his alleged underworld ties had been the subject of considerable media attention. Asserting that he never sought such a status, Rosanova vigorously argued he was not a public figure. However, because some of his contacts with underworld figures were not denied, the court held that Rosanova voluntarily engaged in a course of activity that was bound to invite attention and comment. See Smolla, supra note 8, at 70 n.332 (citing Rosanova with approval). The Fifth Circuit went on to say
 
 
 61
 In our view of the law resulting from the inevitable collision between First Amendment freedoms and the right of privacy, the status of public figure vel non does not depend upon the desires of an individual. The purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure. Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow. It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient, as the district court found, that "Mr. Rosanova voluntarily engaged in a course that was bound to invite attention and comment." 411 F.Supp. at 445
 
 
 62
 580 F.2d at 861;[9] see also Barger v. Playboy Enterprises, Inc., 564 F.Supp. 1151, 1156 (N.D.Cal.1983) (wives of Hell's Angels are public figures), aff'd, 732 F.2d 163 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984).
 
 C.
 
 63
 With regard to the nature and extent of Marcone's participation in drug activities, Penthouse points to three factors which it asserts establish Marcone as a limited purpose public figure: (1) Marcone's indictment in the drug trafficking conspiracy and the attendant publicity; (2) his representation of motorcycle gang members; and (3) his non-representational ties to the Pagans and Warlocks.
 
 
 64
 After determining that the allegedly libelous statement concerns a public controversy, it is necessary to examine the nature and extent of Marcone's involvement in it. Marcone, along with 24 other co-defendants was indicted in Detroit for allegedly participating in a nationwide drug trafficking ring which at that time reportedly was the largest drug smuggling case in United States history. Marcone's indictment was widely reported by the Philadelphia area media. The headline story in The Evening Bulletin on February 11, 1976, the day after the indictment was handed down, was entitled "Media Lawyer Accused of Role in Drug Ring." The article reported the massive scale of the alleged ring with one ironic twist to the story. The original Detroit indictment named only one Philadelphia area man--Frederick Frey. Marcone was representing Frey with respect to the indictment when the grand jury issued a superseding indictment naming Marcone, Frey and two other men with Philadelphia connections: James Heron and Joseph Mealy. The Evening Bulletin article quoted Marcone as expressing his surprise and professing his innocence with respect to his indictment.
 
 
 65
 Penthouse points to Marcone's indictment and the accompanying publicity to establish him as a limited purpose public figure. In Wolston, the Supreme Court rejected the contention that "any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction." 443 U.S. at 168, 99 S.Ct. at 2708; cf. Firestone, 424 U.S. at 457, 96 S.Ct. at 966 (status as participant in litigation does not automatically render one a public figure). Although the criminal activity, by itself, may not create public figure status, such activity may, nevertheless, be one element in a mix of factors leading to that classification. See Rosanova, 580 F.2d at 861; Orr v. Argus-Press Co., 586 F.2d 1108, 1116 (6th Cir.1978), cert. denied, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). Moreover, the crime involved in Wolston was particularly passive--a contempt citation for failure to appear at a grand jury hearing because of ill health. In the present case, however, Marcone was indicted for participating, not in a passive manner, in a drug conspiracy. This factor may be considered in our analysis of Marcone's status. See Rosanova, 580 F.2d at 861.
 
 
 66
 Marcone's indictment was widely reprinted in the local media. Moreover, the drug ring with its prominent local connection became the subject of intense attention by the Philadelphia media. In this regard, federal law enforcement agents were quoted as saying that the four Philadelphia-area co-indictees frequently met at the Castle, a large mansion in Delaware County which served as the headquarters for the Pagans motorcycle gang. Numerous news stories focused on the Castle and a list of illegal activities connected with it, including drugs, stolen goods, and the disappearance and suspected murder of five young women. Subject to even closer scrutiny were the occupants of the Castle, the Pagans, and a rival gang, the Warlocks. Federal sources linked the Pagans and their illegal drug activities to the two billion dollar drug-smuggling ring brought to light by the Detroit indictment.
 
 
 67
 Plaintiff was closely linked to the Castle and the Pagans in a number of ways. Marcone had a significant criminal practice and frequently represented the Pagans and Warlocks in legal matters. Representation of such notorious groups does invite attention, and, in fact, this legal relationship was widely reported in the Philadelphia-area media. Nevertheless this evidence is not determinative in our analysis. Legal representation of a client, by itself, does not establish an individual as a public figure. To hold otherwise would place an undue burden on attorneys who represent famous or notorious clients. See Gertz, 418 U.S. at 352, 94 S.Ct. at 3013; Steere v. Cupp, 226 Kan. 566, 571, 602 P.2d 1267, 1273-74 (1979).
 
 
 68
 Of course, if an attorney does more than merely represent the client in a strictly legal context--such as holding news conferences or otherwise affirmatively making a public issue of the case--then those activities may be counted in the public figure calculus. See, e.g., Ratner v. Young, 465 F.Supp. 386, 399-400 (D.V.I.1979) (defense attorneys in widely publicized trial deemed public figures because of their out of court activities); see also Woy v. Turner, 573 F.Supp. 35 (N.D.Ga.1983) (sports agent who uses media to promote his clients and himself is a limited purpose public figure). Nothing in the record of the present case indicates that Marcone was engaged in bringing attention to his clients or himself in regard to their legal relationship. Thus we may give only limited significance to Marcone's representational activities in the public figure analysis.
 
 
 69
 More important for the limited public figure determination are Marcone's non-representational contacts with the Pagans. As noted, Marcone reportedly met at the Pagans' headquarters with Frey, Heron and Mealy. In addition, one newspaper article reported that Marcone admitted to going on occasional weekend trips with motorcycle gang members. For purposes of public figure analysis we must look to Marcone's actions in addition to his intentions. There is no evidence that his conduct was intended to attract attention; but this does not end our inquiry. As the Fifth Circuit noted in Rosanova, it may be sufficient that Marcone engaged in a course of conduct that was bound to attract attention and comment.
 
 
 70
 In this regard, Marcone's non-representational connections to the Castle and the Pagans are sufficient to tip the balance in the calculation. Both the Pagans and their headquarters were linked to the two billion dollar drug ring, i.e., the public controversy surrounding the alleged libel. We find that Marcone's voluntary connection with motorcycle gangs--including his meetings at the Castle with Frey and his occasional weekend trips with them--in conjunction with the intense media attention he engendered is sufficient to render Marcone a public figure for the limited purpose of his connection with illicit drug trafficking.
 
 
 71
 This is a close case, and if each element of the equation is taken separately it may be argued that no one aspect may be sufficient to create public figure status. Nevertheless, when all the relevant factors are considered in context and as a whole, we believe that Marcone has crossed the line from private to limited purpose public figure.
 
 
 72
 We are in agreement with the Fifth Circuit that if Marcone's actions are sufficient to transform him into a limited public figure, it is of no moment that Marcone did not desire such status. The purpose of the first amendment would be frustrated if those persons and activities that most require public scrutiny could wrap themselves in a veil of secrecy and thus remain beyond the reach of public knowledge. Cf. Medico v. Time, Inc., 643 F.2d 134, 142 (3d Cir.) (noting difficulty but importance of reporting on organized crime), cert. denied, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). We recognize that there are counterveiling dangers from a media that has untrammeled freedom to publish inaccurate and damaging statements with impunity. Moreover, when a sensational story by one news organization is picked up by many, the snowballing of media attention may transform an unknown individual into a virtual celebrity almost overnight. The possibility therefore exists that by relying on this snowballing of attention a media defendant might be able to bootstrap itself into first amendment protection. Such a sequence of events might concededly defeat public figure status in an appropriate case, but plaintiff's situation is not such a case.
 
 
 73
 Given the public nature of the activities at issue here, the widespread media attention and the significant contact to the Pagans of a non-representational type, we hold that Marcone has crossed the threshold and become a limited purpose public figure.[10] Accordingly, the district court erred in not classifying Marcone as a limited purpose public figure.[11]
 
 IV.
 
 74
 Since Marcone is a limited purpose public figure, he must establish libel under the New York Times actual malice standard. Because the district court ruled that Marcone was a private figure, it permitted the jury to award compensatory damages upon a demonstration that Penthouse merely was negligent in publishing the article.[12] Nevertheless, the trial court did charge the jury that Marcone had to demonstrate actual malice to recover punitive damages. The jury did award Marcone punitive damages, thus demonstrating that it found that Marcone had met the requisite standard. Accordingly, even though the judge incorrectly charged the jury regarding compensatory damages, if it properly found that Marcone has proven that Penthouse published the article with actual malice, the jury's award of compensatory and punitive damages could be upheld.
 
 
 75
 Penthouse, however, challenges the award of punitive damages to Marcone, complaining that such an award was based on an erroneous jury instruction. Regarding punitive damages, the judge instructed the jury:
 
 
 76
 The plaintiff must prove by a preponderance of the evidence that the defamatory portions of the article were published either with knowledge of their falsity or with reckless disregard as to whether they were true or false. Punitive damages for the purpose of punishing a defendant for its outrageous conduct if you find, of course, that the plaintiff has proven by a preponderance of the evidence that the conduct of the defendant was outrageous.
 
 
 77
 App. at 1374a (emphasis added). Penthouse maintains that this charge misstates the actual malice standard and requires a lower burden of proof than is constitutionally mandated.
 
 
 78
 In New York Times the Supreme Court defined the "actual malice" standard as "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." 376 U.S. at 280, 84 S.Ct. at 726. Subsequently, the Court further explained the reckless disregard component of the actual malice standard. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In Gertz, the Court equated reckless disregard with a "subjective awareness of probable falsity." Gertz, 418 U.S. at 335 n. 6, 94 S.Ct. at 3004, n. 6; see also Steaks Unlimited, 623 F.2d at 275.
 
 
 79
 As with actual damages, the Supreme Court has held that the states are free to impose punitive damages in defamation cases as long as they comport with the requirements of the First Amendment. In general, Pennsylvania permits punitive damages "against a person to punish him for his outrageous conduct." Chambers v. Montgomery, 411 Pa. 339, 334, 192 A.2d 355, 358 (1963) (quoting Restatement of Torts Sec. 908(1)); see also Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1276-79 (3d Cir.1979) (en banc).
 
 
 80
 The district judge's instruction that plaintiff had to prove "outrageous conduct" appears to be an accurate reflection of Pennsylvania law.[13] However, to be permissible, the charge also had to meet the First Amendment requirements established by the Supreme Court. Because "outrageous conduct" does not connote subjective awareness of falsity, we agree with Penthouse that the judge's charge regarding the definition of actual malice was flawed.
 
 B.
 
 81
 In addition, defendant complains that the district judge incorrectly instructed the jury regarding the burden of proof for punitive damages. In New York Times, the Supreme Court stated that "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands." 376 U.S. at 285-86, 84 S.Ct. at 729 (emphasis added). This statement has been understood to mean that when a plaintiff has the burden of proving actual malice, he must do so by "clear and convincing" evidence. In Gertz, for example, the Court emphasized that the actual malice standard is satisfied "only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." 418 U.S. at 342, 94 S.Ct. at 3008; see also Bose Corp. v. Consumers Union of United States, Inc., --- U.S. ----, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).
 
 
 82
 We agree with Penthouse that in the present case, the public figure plaintiff had to prove actual malice by clear and convincing evidence. Consequently, we need not determine the appropriate level of proof (i.e., clear and convincing or preponderance of the evidence) that a private defamation plaintiff must demonstrate to recover punitive damages.
 
 V.
 
 83
 Because the jury received incorrect instructions regarding the proper level of proof and the definition of actual malice, its award of punitive damages was made under a constitutionally deficient standard. Therefore, we cannot use that verdict as a predicate to affirm the award of compensatory as well as punitive damages. But, rather than remand for a new trial, we have the power to make a de novo review of the evidence of actual malice. See Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); New York Times, 376 U.S. at 284-86, 84 S.Ct. at 428-29. In First Amendment cases, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.' " Bose Corp. v. Consumers Union of United States, Inc., --- U.S. ----, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting New York Times, 376 U.S. at 285, 84 S.Ct. at 728). Accordingly, a de novo review is not only within our province, but is an affirmative duty of a reviewing court.
 
 
 84
 It reflects a deeply held conviction that judges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."
 
 
 85
 Bose, 104 S.Ct. at 1965; see also Lerman v. Flynt Distributing Co., Inc., 745 F.2d 123, 140 (2d Cir.1984).VI.
 
 
 86
 Penthouse's article contains two inaccuracies with respect to plaintiff. First, it states as a fact that Marcone purchased $25,000 worth of marijuana when Marcone was only indicted but never convicted of such conduct. Second, the article incorrectly declares that the reason charges against Marcone were dropped was because he cooperated with the authorities.
 
 A.
 
 87
 The original draft of the article, submitted by free-lance author Edward Rasen, apparently made the assertion that Marcone had purchased marijuana. Penthouse points to three sources to demonstrate that this factual error was made without actual malice. First, the magazine relied on the experience and reputation of Rasen. Mr. Goode, Penthouse's editorial director in 1978, had known Rasen as an investigative reporter and writer since the early 1970's. In 1971, when Goode was at Earth Magazine, he hired Rasen to provide information about Vietnam and found Rasen's material to be reliable. In 1978 Rasen approached Penthouse regarding a series of articles on drugs. Goode appointed John Lombardi, an articles editor, to work with Rasen. Lombardi testified, by deposition, that Rasen had previously written for several west coast newspapers, including the Los Angeles Times, and worked in electronic journalism for west coast television stations. Lombardi, like Goode, found Rasen to be a very professional investigative journalist. Reliance on the professional reputation of an author may help to defeat an allegation of actual malice.[14]
 
 
 88
 Failure to investigate, without more, does not demonstrate actual malice. See St. Amant, 390 U.S. at 731; 88 S.Ct. at 1325; New York Times, 376 U.S. at 288, 84 S.Ct. at 730. In St. Amant, Deputy Sheriff Thompson sued St. Amant, a candidate for public office, for defamation. Based on a source whose reputation he did not know and without any independent investigation, St. Amant incorrectly asserted that Thompson had taken bribes. The Supreme Court held that on those facts actual malice was lacking because "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325; see also New York Times, 376 U.S. at 288, 84 S.Ct. at 730 (failure of newspaper's employees to verify the facts contained in an advertisement against new stories in its own files amounted at most to negligence, and was "constitutionally insufficient to show the recklessness that is required for a finding of actual malice.")
 
 
 89
 The Court noted that there are limitations on the actual malice element of First Amendment protection. A mere assertion by the publisher that he thought the statement published to be true does not automatically defeat actual malice. In some instances, bare professions of good faith may be unpersuasive, such as where the "publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. But, the Court reiterated, mere failure to investigate does not establish bad faith.
 
 
 90
 Thus even if Penthouse had failed to investigate, its reasonable reliance on Rasen arguably would have been sufficient to defeat plaintiff's attempt to show actual malice. Here, however, Penthouse did attempt to verify the assertions in the article; its editors obtained a copy of the Detroit indictment that charged Marcone with the crime for which the article stated he committed. In addition, the magazine had an article from the Philadelphia Inquirer, dated March 18, 1976, which reported on Marcone's indictment. Consequently, in publishing the information about Marcone, Penthouse relied on the apparent reputation of Rasen, partially based on his prior relationship with Penthouse staffers, Rasen's notes, a copy of the Detroit indictment, and the article in the Philadelphia Inquirer. The statement was not so "inherently improbable" that defendant should have been put on notice as to its probable falsity. See St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. While the newspaper article and indictment do not prove the truth of the assertion, they are sufficiently related to the statement in question that we cannot say the whole story is a fabrication or a product of the author's imagination. Penthouse may have been negligent in not investigating further to determine the veracity of the statement, see Dickey v. CBS, 583 F.2d 1221 (3d Cir.1978), and in failing to distinguish between an allegation and a proven fact. But the failure to use the word "alleged," under these circumstances, does not establish actual malice. See Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); see also Ryan v. Brooks, 634 F.2d 726 (4th Cir.1980).
 
 B.
 
 91
 The second error contained in the article is that charges against Marcone were withdrawn because of his cooperation with the authorities. In fact, charges against Marcone were dismissed without prejudice so that he could be reindicted in Philadelphia. Two earlier versions of the article do not contain this misinformation. They both state that "charges were dismissed in favor of another indictment." App. at 38a, 94a. Both Goode and Lombardi were unable to explain why or when this change occurred.
 
 
 92
 The source of the mistaken alteration is clear, however; Penthouse produced a report of a hearing on illicit Mexican-American drug traffic before a Senate Subcommittee, Illicit Traffic in Weapons and Drugs Across the United States-Mexican Border: Hearings Before the Permanent Subcommittee on Investigations of the Senate Comm. on Gov't Operations, 95th Cong., 1st Sess. 24 (1977). This report, supplied to the Senate Subcommittee by the Drug Enforcement Administration, listed the disposition of drug conspiracy charges against a number of individuals. The relevant part of the report states:
 
 Defendant: Charles S. Hewett (Class I).i
 
 93
 Maximum sentence: 5 years.
 
 
 94
 Actual sentence: Dismissed at request of Government due to cooperation.
 
 
 95
 Defendant: Blanca Reid (Class III).
 
 
 96
 Maximum sentence: 5 years.
 
 
 97
 Actual sentence: Dismissed in interest of Justice.
 
 
 98
 Defendant: Frank Marcone (Class III).
 
 
 99
 Maximum sentence: 5 years.
 
 
 100
 Actual sentence: Dismissed (to be reindicted in Philadelphia).
 
 
 101
 Defendant: Michael Hearn (Class III).
 
 
 102
 Maximum sentence: 5 years.
 
 
 103
 Actual sentence: Dismissed (to be reindicted in Philadelphia).
 
 
 104
 Footnote one, which refers only to Charles S. Hewett, indicates that Hewett cooperated with the government in order to receive a reduced sentence. All that is stated about Marcone is that his indictment was dismissed and that he was to be reindicted in Philadelphia. Someone at the magazine apparently misread the footnote as also referring to the individuals listed below Hewett, including Marcone, or somehow confused the two men. Immediately below Marcone in the Penthouse article's list of "attorney criminals" is Hewett. With regard to Hewett, Penthouse correctly states that charges against him were dismissed because of cooperation with the government. The mistake regarding Marcone might be called unprofessional, even negligent, but it cannot be said to rise to the level of actual malice.
 
 
 105
 In reviewing the jury's verdict, the district court found that these two errors did constitute actual malice. 577 F.Supp. at 328-32. In doing so, the court mistakenly focused on the falseness of the statements. Although the lack of truthfulness of a statement is a prerequisite to liability, mere falsity, without more, is generally not sufficient to establish actual malice. See St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. Neither statement was so inherently improbable that Penthouse should have been put on notice of the probability of falseness. In addition, though Penthouse was arguably negligent in not checking further into the background of Rasen, the personal knowledge and reputation of Rasen were sufficient so that the magazine could reasonably have placed some reliance upon him for purposes of defeating actual malice. Both mistakes appear to be the result of insufficient editorial verification and checking procedures, but not of a conscious decision to present Marcone in a false light.
 
 
 106
 Thus based on our independent review of the record we conclude that the plaintiff failed to prove, either by clear and convincing evidence or even by a preponderance of the evidence, that the libelous statement was published with actual malice.[15]
 
 
 107
 The judgment of the district court will be reversed and judgment for the defendant will be entered.
 
 
 
 [1]
 At common law, a plaintiff could not recover for slander, i.e., oral defamation, without proof that the utterance caused him "special" harm--"harm of a material and generally of a pecuniary nature." Agriss, 483 A.2d at 469 (quoting Restatement of Torts Sec. 575, Comment b (1938)). Mere loss of reputation was not sufficient to permit recovery. Eventually several exceptions were carved out of this general rule for slanders that were deemed to be so naturally injurious that actual injury was presumed. Thus statements imputing crime, loathsome disease, or shortcomings affecting a plaintiff's business, among others, were deemed slander per se. See W. Prosser, Handbook of the Law of Torts Sec. 112, at 754 (4th ed. 1971); 3 W. Blackstone, Commentaries * 123-24. The terms per se and per quod became pleading devices in slander cases to indicate whether the plaintiff had to prove general or special damages. See Agriss, 483 A.2d at 470
 The per se/per quod distinction in libel had a different origin. Written statements that were defamatory on their face were deemed libel per se. Statements that were not defamatory in meaning on their face but required proof of "facts and circumstances imparting a defamatory meaning" were termed libel per quod. Id. But once libel was proved--either per se or per quod--it was actionable without proof of special damages. The law presumed harm when a libel occurred, because of the "greater permanency, dissemination, and credence" attached to printed as opposed to spoken words. Id.
 Inevitably the two uses of per se/per quod became intermingled, and libelous statements falling under the slander per se categories, such as imputation of crime, were considered actionable without proof of special damages even if the libel were per quod--i.e., required extrinsic facts to prove libelous character. See Prosser, Libel per Quod, 46 Va.L.Rev. 839 (1960).
 
 
 [2]
 Thus the district judge's ruling that the article was libel per se means only that it was libelous on its face; this classification has no bearing on whether special damages had to be proven
 
 
 [3]
 Almost two hundred years ago, James Madison recognized that "[s]ome degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press." 4 J. Elliot, Debates on the Federal Constitution of 1787, at 571 (1876)
 
 
 [4]
 The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court. See, e.g., Rebozo v. Washington Post Co., 637 F.2d 375, 379 (5th Cir.), cert. denied, 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 379 (1981); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); see also Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); Avins v. White, 627 F.2d 637 (3d Cir.), cert. denied, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980)
 
 
 [5]
 See, e.g., Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); Harris v. Tomczak, 94 F.R.D. 687 (E.D.Cal.1982); Ashdown, Of Public Figures and Public Interest--The Libel Law Conundrum, 25 Wm. & Mary L.Rev. 937 (1984); Daniels, Public Figures Revisited, 25 Wm. & Mary L.Rev. 957 (1984); Schauer, Public Figures, 25 Wm. & Mary L.Rev. 905 (1984)
 
 
 [6]
 For attempts at fuller exposition of this category see, for example, Waldbaum, 627 F.2d at 1294-95; Tomczak, 94 F.R.D. at 700-03. One commentator has recently advocated eliminating this category. See Note, General Public Figures Since Gertz v. Robert Welch, Inc., 58 St. John's L.Rev. 355 (1984)
 
 
 [7]
 The proper dimensions of the public controversy requirement have proved difficult to diagram. For examples of courts' grappling with this problem, see Comment. Defining a Public Controversy in the Constitutional Law of Defamation, 69 Va.L.Rev. 931 (1983)
 
 
 [8]
 We reject the notion that merely because most people would agree that drug trafficking is undesirable, there is no "controversy" regarding the matter. See Wolston, 443 U.S. at 163 n. 6; 99 S.Ct. at 2705 n. 6, Smolla, Let the Author Beware: The Rejuvination of the American Law of Libel, 132 U.Pa.L.Rev. 1, 56-57 (1983)
 
 
 [9]
 Some courts and commentators have questioned whether Gertz also created a third class of public figures: the involuntary public figure. See, e.g., Waldbaum, 627 F.2d at 1295 n. 18; Steaks Unlimited, 632 F.2d at 272-73; Note, The Involuntary Public Figure Class of Gertz v. Robert Welch: Dead or Merely Dormant?, 14 U.Mich.J.L. Ref. 71 (1980). In general, rather than creating a separate class of public figures, we view such a description as merely one way an individual may come to be considered a general or limited purpose public figure. Thus, to the extent a person attains public figure status by position, status, or notorious act he might be considered an involuntary public figure. The one group of individuals that might truly be considered involuntary public figures are relatives of famous people. See Meeropol v. Nizer, 381 F.Supp. 29 (S.D.N.Y.1974) (children of Julius and Ethyl Rosenberg are public figures), aff'd in relevant part, 560 F.2d 1061 (2d Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); see also Carson v. Allied News Co., 529 F.2d 206, 210 (7th Cir.1976) (wife of famous entertainer a public figure); Note, An Analysis of the Distinction Between Public Figures and Private Defamation Plaintiffs Applied to Relatives of Public Persons, 49 S.Cal.L.Rev. 1131 (1976). In Gertz, the Supreme Court cautioned that "the instances of truly involuntary public figures must be exceedingly rare." 418 U.S. at 345, 94 S.Ct. at 3009
 
 
 [10]
 We note that theoretically the passage of time might permit a public figure to regain private status, but such was not the case here
 
 
 [11]
 This decision is tied to the facts of this case. We emphasize that we do not hold that an attorney whose connection to notorious clients remains purely professional or any person charged with a crime automatically becomes a limited purpose public figure
 
 
 [12]
 Because we hold that Marcone was a public figure and had to prove actual malice to recover anything, we need not reach the propriety of the district court's ruling regarding the applicable standard for a private defamation plaintiff to recover compensatory damages. For the latest pronouncement by the Supreme Court of Pennsylvania on that subject, see Hepps v. Philadelphia Newspapers, Inc., --- Pa. ---, 485 A.2d 374 (1984)
 
 
 [13]
 For the latest pronouncement on Pennsylvania law, see Hepps v. Philadelphia Newspapers, Inc., --- Pa. ---, 485 A.2d 374 at 389 (1984) (holding that private defamation plaintiff must prove actual malice by clear and convincing evidence to recover punitive damages)
 
 
 [14]
 Ironically, Rasen himself was indicted in Detroit along with Marcone in the drug conspiracy. Plaintiff does not dispute, however, that Penthouse had no knowledge of this fact before it published the article. In light of Goode's personal knowledge of Rasen and the author's general reputation, at most, Penthouse might have been negligent for not investigating Rasen's background
 
 
 i
 Defendants [sic] sentence reduced at the request of the U.S. Attorney's Office due to cooperation. (emphasis added)
 
 
 [15]
 Because of our disposition of the case, we do not reach defendants' other grounds for attacking the judgment for Marcone