## Joseph v. The Scranton Times

*George W. Croner,* and *Timothy P. Polishan,* for plaintiffs.

*W. Thomas McGough Jr.,* and *J. Timothy Hinton,* for defendants.

VAN JURA, *J.,* December 8, 2011—

## I. PROCEDURAL AND ADMINISTRATIVE HISTORY

This action arises from a series of articles published in the *Citizens' Voice* newspaper in Wilkes-Barre, Pa. reporting the undisputed fact of a federal criminal investigation into the alleged ties of William D'Elia (D'Elia) and, *inter alia.,* Thomas A. Joseph, Sr. (Joseph, Sr.) to organized crime activities, which included the execution of search warrants[1] on May 31, 2001 at the

---

1. The affidavit of probable cause supporting the search warrants was not unsealed until May of 2006. The allegations underlying the search warrants were not available at the time the *Citizens' Voice* articles were published, The search warrants, inventories, and affidavits of probable cause as to Acumark, Joseph, Sr., and Marranca were admitted in evidence (DTE-1 through 6) for the purpose of showing that there was an investigation. The contents of the affidavits are hearsay and are not considered in this opinion.

residence of Joseph, Sr. and the offices of Acumark, Inc., the residence of Sam Marranca, the residence of Jeanne Stanton, and the residence of D'Elia, by large contingents of federal agents and state troopers. As a result of the May 31, 2001 searches, the local print news media, including the *Times Leader* and the *Citizens' Voice*, began reporting news articles on June 1, 2001. The *Citizens' Voice*, owned by the defendant, Scranton Times LP, published 10 news articles from June 1, 2001 through October 10, 2001, which involved Joseph, Sr. and/or Acumark. The first two articles were written solely by defendant, James Conmy[2], and the other eight articles were written by defendants, Edward Lewis and James Conmy. Only one of the articles (8/6/01; JTE-F) mentioned Joseph, Jr. While none of the articles named either Airport Limousine and Taxi Service, Inc., or Airport, Taxi, Limousine and Courier Service of Lehigh Valley, Inc.[3], three of the articles (JTE-C, D & F) reported on an airport and limousine service that one article (JTE-F) indicated was owned by Joseph, Sr., and Joseph, Jr.

On May 22, 2002, the plaintiffs commenced a defamation action against the defendants pursuant to 42 Pa. C.S.A. §§8341-8345 (Uniform Single Publication Act). The complaint contained eight counts, alleging a count of defamation and a count of false light/invasion of privacy on behalf of each of the plaintiffs against the defendants. In May, 2006, an eight-day non-jury trial was held before former judge Mark A. Ciavarella, who, at the conclusion

---

2. The plaintiffs agree that the first two articles were not defamatory.

3. A compulsory non-suit was entered against the plaintiff, Airport, Taxi, Limousine and Courier Service of Lehigh Valley, Inc., at the close of the plaintiffs' case.

of trial, dismissed the claims of Joseph, Jr. and the plaintiffs' claims for punitive damages. Judge Ciavarella entered a verdict in favor of the remaining plaintiffs on the other claims. Judge Ciavarella's verdict was affirmed by the Pennsylvania Superior Court, however, pursuant to its *King's Bench* supervisory powers, the Pennsylvania Supreme Court vacated the verdict and judgment and remanded the case for a new trial. The case was assigned to the undersigned judge in accordance with the terms of the remand.

Pretrial, this court considered an omnibus motion for summary judgment filed on behalf of all the defendants and dismissed claims against several of the named defendants. The court also dismissed the false light/ invasion of privacy claims of plaintiffs Acumark, Inc., Airport Limousines and Taxi Service, Inc., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc.

A non-jury trial as to the remaining defendants and causes of action was held before this court commencing May 2, 2011.

1. *The Citizens' Voice Articles*

While the *Citizens' Voice* published 10 articles from June 1 to October 10, 2001, the plaintiffs agreed that the first two articles (JTE-A & B) were not defamatory. The remaining eight articles at issue are summarized below.

The article of June 5, 2001 (JTE-C), written by

defendants Comny[4] and Lewis, indicates that, according to "a source," the reason for the search warrants of May 31 was a money-laundering scheme involving "three main players" whose residences were searched, plaintiff Acumark and "a limousine/taxi service in Pittston Township." The article indicates that money was also laundered through a "now-defunct weekly newspaper called *The Metro*." The article references D'Elia, La Cosa Nostra Crime Family and reputed mobsters Russell Bufalino and Ralph Natale. The article contains the photograph of only one person: Joseph, Sr. The article contains confirmation from Joseph, Sr.'s civil attorney that records were removed from Acumark's Pittston office, followed by an assertion based on an unnamed source, that records of *The Metro* were seized from 1303 Wyoming Avenue[5].

There were no further articles until two months later.

On August 5, 2001 (JTE-D), the *Citizens' Voice* published an article written by defendants Conmy and Lewis. The article asserts, without indicating a source, that arrests at a former Avoca bar (Lavelle's Pub) three years before are connected to the money laundering investigation. In the next paragraph, the article states that a limousine and taxi service based at both the Wilkes-Barre/Scranton and Lehigh Valley international airports is under federal focus for transporting money, drugs, prostitutes and guns to and from Atlantic City, Philadelphia, and New York. It is followed by another paragraph describing how Lavelle's Pub was used for the purposes of the use and distribution

---

4. Testimony at trial indicated that Conmy wrote nothing new for the later articles, which repeated portions of the first two articles that the plaintiffs agree were not defamatory.

5. Other articles indicate that this was Sam Merranca's office.

of cocaine. After several paragraphs about Lavelle's Pub, the article describes how prostitutes from an escort service operated by Al Carpinet, Jr., were used to entertain clients, followed by assertions, without attribution to a source, that a federal grand jury is investigating information that as much as $3 million was laundered through *The Metro* and ending with a paragraph about the above-described May 31 searches. The gist of the article is that the investigations of Lavelle's Pub and Al Carpinet, Jr., and the purported investigations of an airport taxi and limousine service that is transporting money, drugs, prostitutes, and guns and of *The Metro,* are related to the searches of May 31, 2001. Nowhere in the article is it indicated that the assertions are only allegations, and nowhere is/are the source(s) of the assertions indicated.

On August 5, 2001, defendant Lewis authored a separate article headlined "Firearms dealer denies involvement in alleged money laundering scheme" relating to an alleged firearms dealer, Gus Salazar (JTE-E), and indicating that both Salazar and Joseph, Sr., collect guns and use the same attorney. The article concludes by stating that the money laundering investigation is related to the investigation of Salazar. The parties agreed that neither side would call Salazar as a witness at trial, and stipulated that his testimony at the prior trial contained in JTE-38 would be excluded from consideration in this trial. This was done.

On August 6, 2001, the *Citizens' Voice* published an article written by defendants' Conmy and Lewis on page 3[6] entitled "Probe investigating pub clientele," which was

_____

6. This is the only article where the page placement of the article is indicated.

continued on page37 under the heading "Probe: Customers under scrutiny" (JTE-F). The article indicates that, according to "an investigative source," a frequent visitor at Lavelle's Pub "is a relative to one of three persons who received a target letter" from a Harrisburg federal grand jury investigating money laundering and indicates that the "the investigation expanded to include prostitution, gun running and further drug trafficking." At the continuation of the article on page 37, after repeating earlier assertions that *The Metro*, "formerly owned by Joseph (Sr.)" was used to launder $3 million, the article asserts that a taxi and limousine service owned by Joseph, Sr., and Joseph, Jr., "is being looked at as a means to transport money, drugs, prostitutes and guns to and from Atlantic City, Philadelphia and New York City, several reliable sources said." The article indicates: "A source said that although the transportation service at the Wilkes-Barre/ Scranton International Airport promotes limousines, no such vehicles exist. The source continued to explain that the money, drugs and guns are kept in attaché cases in the trunks of the vehicles when they transport the goods to the larger cities."

The next day, August 8, 2001, the *Citizens' Voice* published an article written by defendant Lewis (JTE-G) indicating that Bob Butts, who published *The Metro* with Joseph, Sr., "didn't see Joseph do anything wrong" and indicating again that, during the searches of May 31, 2001, records of *The Metro* were found in an office purportedly leased by Samuel Marranca and that one of the other individuals whose home was searched, D'Elia, "is a reputed mob boss." The article indicates that Joseph, Sr., Marranca, and D'Elia "are at the center" of a federal

investigation into money laundering that "expanded in recent weeks when federal investigators learned about drug-trafficking, prostitution, and gun running to and from Atlantic City and other larger cities." Otherwise, the article purports to be about Butts' disclaimers that *The Metro* was profitable.

Four days later, on August 12, 2001, the *Citizens' Voice* published an article by Lewis entitled "Report Judge Barrasse linked to IRS investigation...Officials say he is not connected to former Lavelle's Pub Avoca" (JTE-H). Citing "several reliable sources," the article repeats the substance of the assertions that a cocaine ring was operating out of Lavelle's Pub and indicates that "Lavelle's Pub was not involved in the laundering of money," but is connected to the money laundering investigation and to an investigation of Al Carpinet, Jr., because of the pub's clientele. The article indicates that one of at least three persons who sold cocaine at the pub "is related to two of the three persons who received target letters." The article concludes by describing the May 31 searches of Marranca's, D'Elia's and Joseph, Sr.'s residences and of Acumark and concludes by asserting that "a source close to the investigation" said that close to $3 million was laundered through *The Metro*.

The next article by Lewis was published by the *Citizens' Voice* on August 20, 2001 (JTE-I). The article states, "a source close to the probe said" that the money laundering investigation "has expanded to include possible abuse of power and political corruption for personal gain... It also includes prostitution involving alleged pimp Al Carpinet, Jr. and drug trafficking similar to the 1986

federal prosecution of Frederick Luytjes," indicating that the federal grand jury investigation of money laundering through *The Metro* and Acumark is being headed by the same prosecutor (Zubrod) who prosecuted Luytjes. The laundered money, according to a source, came from overfill at landfills in the state. The new information, "a source said," was "learned soon after the searches on May 31 on several homes and businesses, including Acumark Inc."

The final article, written by Lewis, was published by the *Citizens' Voice* on October 10, 2001 (JTE-J) and was headlined "3 witnesses subpoenaed in money-laundering investigation." Isolated portions of the article are offset as follows: "QuickInfo — 1 of those ordered to testify before a grand jury in Harrisburg had ties to an Avoca tavern that was closed in 1998 following a federal and state probe. Part of investigation centers on reputed crime boss William D'Elia of Hughestown" and "THIS investigation took off since May 31." The article indicates that at least three persons have been subpoenaed to the grand jury investigating money laundering and at least one of them has ties to Lavelle's Pub. The article asserts that the grand jury "began hearing testimony from witnesses…following nine months of video surveillance on key suspects." After recapping the May 31, 2001 searches and indicating that a car occupied by D'Elia and Marranca was also searched, the article indicates, in the same paragraph, that the IRS was investigating more than two years before obtaining a court order for video surveillance and that information has been received suggesting that as much as $3 million was laundered through *The Metro*. The article republishes the assertion that most, if not all, of the laundered money

was from overfill and the selling of open airspace at several landfills in Pennsylvania. According to the article, "Investigators also 'stumbled' upon drug-trafficking, prostitution, gambling and gun-running."

## 2. *The Times Leader Articles*

The *Times Leader* is a newspaper also serving the geographic area served by the *Citizens' Voice*. The six articles in the *Times Leader* covering the May 31, 2001 searches, however, ended on June 8, 2001 and were different from the articles in the *Citizens' Voice*.

The article that appeared on pages 7A and 9A of the *Times Leader* on June 2, 2001 indicated simply that searches had taken place (JTE-32). While it indicates that Peter Trucksis, a special agent with the FBI in Philadelphia, acknowledged that an active investigation was underway, and quotes Joseph, Sr.'s attorney (Michael Mey, Esquire), there is a different level of attention to Joseph, Sr., and the location, later identified by the *Citizens' Voice* as Marranca's office, is described as "unoccupied."

The *Times Leader* article appearing on pages 3A and 8A on June 3, 2001(JTE-33) focuses on the searches of the homes of Jeanne Stantion and D'Elia and again quotes Agent Trucksis confirming that Acumark, a former floral shop in Exeter and a Forty Fort residence, were also targeted. The article indicates that Agent Trucksis would not say if the searches were related.

The *Times Leader* article of June 4, 2001 (JTE-34), headlined "Organized crime unit connected to searches," indicates that state police referred inquiries to the state Bureau of Criminal Investigation, and the telephone

number given was for the Northeastem Organized Crime Unit of the Bureau. The article states that details of the search warrants have been withheld, that the Organized Crime Unit did not return a telephone message, and that neither Jearme Stanton, nor D'Elia, would comment. Joseph, Sr.'s attorney is quoted as saying, "My guy doesn't know what's going on."

The *Times Leader* article appearing on pages 1A and 10A of the newspaper on June 5, 2001 (JTE-35) contains a photograph of D'Elia and Stanton, photographs of the properties searched, and a map depicting the locations of the properties searched. The property on Wyoming Avenue in Exeter is identified as Marranca's import/export business. The article indicates that federal and state authorities have not indicated why the properties were searched and indicates that the warrants remain sealed. The article also indicates that, notably, Joseph, Sr.'s lawyer said that he's been told that the searches stem from a grand jury investigation. Attorney Mey is also quoted as saying that Joseph, Sr. and D'Elia have had past "business relationships." Alongside the lead article on page 1A is an article entitled, "Search warrants different for Feds," which indicates that a federal search warrant may be based on anonymous tips and a reasonable suspicion. This article appeared on the same day as the third *Citizens' Voice* article (JTE-C). It does not have a photograph of Joseph, Sr.

The article appearing on pages 1A and 12A of the *Times Leader* on June 7, 2001 (JTE-36) was headlined "Subject of search runs many businesses: Pittston businessman Thomas Joseph operates transportation service at area's airport. Authorities searched his home and offices

last week." The article describes Joseph, Sr.'s various business ventures over the years, including Acumark, Inc., Markdata, Inc., Airport Limousine and Taxi, Inc., and *The Metro* newspaper ("a scrappy tabloid"). The article indicates that, according to Joseph, Sr.'s attorney, Michael Mey, Joseph and D'Elia had business relationships. The article indicates that Airport Limousine and Taxi Service initially functioned under the corporate name of Pocono Enterprises, Inc. and was owned by Joseph, Sr., and Joseph, Jr, but that Joseph, Jr., sold his interest to Joseph, Sr. for $1 in 1996. It is stated that Airport Limousine and Taxi has been operating at the Wilkes-Barre/Scranton International Airport under two-year contracts since the 1990's, according to Wy Gowell, the assistant director for the airport and "is up for renewal this year." The article indicates that, according to a May 7, 2001 letter to airport director Barry Centini from Joseph, Sr., the company's revenues grew from $159,571 in 1992 to $389,767 in 2000. The article indicates that the state Department of Labor and Industry records describe Acumark Inc. as an outbound phone center at which telephone representatives book tours of the Poconos.

The last *Times Leader* article, appearing on pages 1A and 8A of the June 8, 2001 edition and entitled "D'Elia raid a tax case, source says," (JTE-37) focuses on D'Elia and, for the first time, references at least two sources. "All of the properties and people are linked to a grand jury investigation, sources have said." The article indicates that, according to a source, a safe in D'Elia's house was drilled open and removed during the search and indicates that law enforcement officials have consistently refused to comment on the searches. The article indicates that

sources say D'Elia had an office at Markdata, a business owned by Joseph, Sr. that filed for bankruptcy in 1990.[7]

## II. DISCUSSION

A. Plaintiffs are private figures who have failed to prove their defamation claims by a preponderance of the evidence.[8]

To prove defamation, each plaintiff has the burden of proving, when the issue is properly raised: (a) the defamatory character of the communication; (b) its publication by the defendant; (c) its application to the plaintiff; (d) the understanding by the recipient of it as intended to be applied to the plaintiff; (e) special harm resulting to the plaintiff from publication; and (f) abuse of a conditionally privileged occasion. 42 Pa. C.S.A.

---

7. Also relevant to these proceedings is a *Times Leader* article that was published on August 1, 2004 (DTE-9). The article focused on D'Elia, who the article said was watched for two decades by federal anthorities and who associated with several high profile members of New York and Pennsylvania crime families. The article indicates that, even though charges were never filed against D'Elia, the May 31, 2001 searches were for evidence of a multi-state gambling operation involving illegal gambling, extortion, drugs and stolen merchandise in which seemingly legitimate businesses were used to launder money. The article indicates that, according to an informant, since 1991, Joseph, Sr. laundered $500,000 to $700,000 per year for D'Elia through Acunark, *The Metro*, Antra (a music company), and the Tidewater Marketing Company. The article indicates that Joseph, Sr. was never charged with a crime.

8. In *Philadelphia Newspapers, Inc., et al. v. Hepps et al.*, 475 U.S. 767, 106 S. Ct. 1558 (1986), the United States Supreme Court did not consider the quantity of proof of falsity that a private-figure plaintiff must present to recover damages. In a later case, the court explicitly declined to address the issue. *Harte-Hanks Communications. Inc. v. Connaughton*, 491 U.S. 657, 661, 109 S. Ct. 2678, 2682, ft 2 (1989). In Pennsylvania, both state and federal courts have determined that the burden of proof is "preponderance of the evidence." *Agriss v. Roadway Express, Inc.*, 483 A.2d 461 (Pa. Super. 1984); *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Sup. 2d 425 (E.D. Pa.), aff'd 424 F.3d 336 (3rd Cir. 2005). Accordingly, this court determines that "preponderance of the evidence" is the appropriate standard in this case.

§8343(a); *Weaver v. Lancaster Newspapers, Inc.,* 875 A.2d 1093, 1097 (Pa. Super. 2005); *Tucker v. Philadelphia Dailv News,* 577 Pa. 598, 615, 848 A.2d 113, 124 (Pa. 2004). Conversely, the defendants bear the burden of proving (a) the privileged character of the occasion on which the communication was published, and (b) the character of the subject matter of the defamatory comment as a matter of public concern. 42 Pa. C.S.A. §8343(b).

Pennsylvania courts have recognized that "a plaintiff must demonstrate that the complained-of statement applies to her, i.e., whether it is 'of and concerning' her." *Mzamane v. Winfrey,* 693 F. Supp. 2d 442, 479 (E.D. Pa. 2010); *Schonek v. W.J.A.C., Inc.,* 436 Pa. 78, 83, 258 A.2d 504, 507 (Pa. 1969) ("Defamatory words, in order to be actionable, must refer to some ascertained or ascertainable person, and that person must be the plaintiff.") This is a threshold question in every defamation action. See *Yow v. Nat'l Enquirer,* Inc., 550 F. Supp. 2d 1179, 1184 (E.D. Cal. 2008) ("[i]n a defamation action the threshold question is whether the statement on which plaintiff's claim is based, specifically refers to, or is 'of and concerning' plaintiff in some way."). A party defamed need not be specifically named, if pointed to by description or circumstances tending to identify him. *Cosgrove Studio & Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751 (Pa. 1962) (Under Pennsylvania law, "a defamed party need not be specifically named in a defamatory statement in order to recover, if she is pointed to by description or circumstances tending to identify her."). Thus, if a defamatory publication can reasonably be interpreted as referring to a particular complainant, whether the recipients did so, is for the fact-finder to determine. *Zelik v. Daily News Pub. Co.,* 431

A.2d 1046, 1049 (Pa. Super. 1981) citing *Thomas Merton Center v. Rockwell Int'l Corp.*, 421 A.2d 690, 691 n.2 (Pa. Super. 1980). See Prosser, The Law of Torts, §116 5th ed. (Supp. 1988) ("If the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them or [otherwise] creates a defamatory implication...he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.").

(1) *The Constitutional Considerations Applicable to Plaintiffs' Claims*

The requirement that the defamatory statement be "of and concerning" is not only required by statute, see 42 Pa.C.S. §8343(a)(3), but is also mandated by the First Amendment. See e.g., *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 232 Cal. Rpt. 542, 728 P.2d 177 (1986) (one cannot constitutionally establish liability unless one proves that the contested statements are "of and concerning" the individual, either by name, i.e. refer personally to the individual or by "clear implication.").

In addition to Pennsylvania's statutory requirements for proof of defamation, judicial decisions prescribe additional elements that arise by virtue of the First Amendment's relationship to the law of defamation. If the alleged defamatory communications bear on a matter of public concern[9] and if the defendant is a member of the media, plaintiffs must prove by a preponderance of the evidence, as an additional prerequisite to recovery, that the alleged defamatory communication is in fact false.

---

9. The plaintiffs here concede that the articles reported on matters of public concern.

*Lewis v. Philadelphia Newspapers, Inc.,* 833 A.2d 185, 191 (Pa. Super. 2003); *Philadelphia Newspapers, Inc. et al v. Hepps et al,* 475 U.S. 767, 106 S. Ct. 1558 (1986); *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990).

The First Amendment also requires that, if the plaintiff is a public official, a public figure or a limited purpose public figure, the plaintiff must show "actual malice," by clear and convincing evidence, to establish the liability of the defendant. *New York Times v. Sullivan,* 376 U.S. 254 (1964). Under the standard of *New York Times v. Sullivan,* "actual malice" is a statement published "with knowledge of its falsity or with reckless disregard as to whether it was false; proof of mere negligence does not suffice; rather, the public figure must demonstrate that the author in fact entertained serious doubts as to the truth of the publication or acted with a high degree of awareness of probable falsity." See *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510-511 (1991). Actual malice may be shown by circumstantial evidence. *Curran v. Philadelphia Newspapers, Inc.,* 546 A.2d 639 (Pa. Super. 1988). The "actual malice" standard is a constitutionally mandated safeguard and, as such, must be proven by clear and convincing evidence, the highest standard of proof for civil claims. See *Sprague v. Walter,* 656 A.2d 890 (Pa. Super. 1995). Moreover, evidence adduced is not judged by an objective standard; rather "actual malice" must be proven by applying a subjective standard, by evidence that *"the defendant in fact entertained serious doubts as to the truth of his publication." See Curran, supra.,* 546 A.2d at 642 (citing *St. Amant v. Thompson,* 390 U.S. 727, 731-32 (1968)). If the fact-finder determines that any of the plaintiffs were not public figures, the level of

culpability required to prove defamation is negligence. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974). Under Pennsylvania law, to act with actual malice is defined to mean that a defendant "had knowledge that [a publication] was false or with reckless disregard of whether it was false or not." See *Tucker v. Phila. Daily News,* 577 Pa. 598, 623, 848 A.2d 113, 129 (Pa. 2004). "Reckless disregard" is a term of art and is defined to mean publishing with a "high degree of awareness" of probable falsity. See *St. Amant v. Thompson,* 390 U.S. 727, 728 (1968).

"Public officials" are those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. *Rosenblatt v. Baer,* 383 U.S. 75, 85 (1966). None of the plaintiffs in this action was a "public official" for purposes of the "actual malice" standard announced in *New York Times v. Sullivan,* 376 U.S. 254 (1964).

The parties disagreed whether Joseph, Sr., should be regarded as a limited purpose public figure either because of his association with D'Elia or because his attorney made response to media questions (from both the *Citizens' Voice* and the *Times Leader*). The defendants contend that Acumark was also a limited purpose public figure because of the association of the corporation with D'Elia.[10] The defendants contend that Airport Limousine was a publicly regulated business "whose conduct is a matter of public concern and is within the public realm."

"Limited purpose public figures," for the purposes of

---

10. Pretrial, the defendants argued this issue only as to Joseph, Sr.

applying the "actual malice" standard announced in *New York Times v. Sullivan,* supra. are those individuals or corporations who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved in these controversies. *Brown v. Philadelphia Tribune Co.,* 668 A.2d 159, 162 (Pa. Super. 1995) citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345 (1976); see *Wolston v. Reader's Digest Assoc., Inc.,* 443 U.S. 157, 166-169 (plaintiff who had pleaded guilty to contempt of court for failing to appear in response to a subpoena issued by a grand jury investigating Soviet espionage activities in the United States was not a limited purpose public figure); *Contemporary Mission, Inc. v. The New York Times Co.,* 842 F.2d 612, 617 (2d Cir. 1988) (to establish plaintiff as a "limited purpose public figure" defendant must show that plaintiff has (a) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject matter of the litigation; (b) voluntarily injected himself into a public controversy related to the subject of the litigation; (c) assumed a position of prominence in the public controversy; and (d) maintained regular and continuing access to the media); see also *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 273-74 (3rd Cir. 1980) (a corporation can be a limited purpose public figure).

Whether a defamation plaintiff is a "limited purpose public figure" is a question of law. *Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1551 (4th Cir. 194); *Marcone v. Penthouse Int'l Magaziue for Men,* 754 F.2d 1072, 1082 n. 4 (3rd Cir. 1985); *Mzamane v. Winfrey,* 693 F. Supp. 2d 442, 498 (3rd Cir. 2010); *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 928 (3rd

Cir. 1990); *Brown v. Philadelphia Tribune Co.*, 668 A.2d 159, 162 (Pa. Super. 1995). In making the determination of whether a defamation plaintiff is a limited purpose public figure, the court must look through the eyes of the reasonable person at the facts taken as a whole. *Foretich*, 37 F.3d at 1551, citing *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1292 (D. C. Cir. 1980). As a matter of law, before a plaintiff can be classified as a limited purpose public figure, a defendant must prove that: (1) the plaintiff had access to effective channels of communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public figure status at the time of the alleged defamation. *Wells v. Liddy,* 186 F.3d 505, 534 (4th Cir. 1999); *Foretich,* 37 F.3d at 1553; *Fitzgerald v. Penthouse Int'l, Ltd.,* 691 F.2d 666, 668 (4th cir. 1982); see *Marcone*, 754 F.2d at 1083 ("plaintiff must voluntarily thrust himself into the vortex of the dispute").[11]

---

11. Voluntarily engaging in a matter of public concern requires more than simply issuing defensive statements once the matter is in the public domain. A plaintiff finding himself involved in a matter of public concern may offer defensive, truthful statements without foregoing a private person's protection from defamation. *Clyburn v. News World Communications, Inc.,* 903 F.2d 29, 32 (D. C. Cir. 1990). Under such circumstances, a plaintiff renders himself a public figure only if he voluntarily "draws attention to himself" or uses his position in the controversy "as a fulcrum to create public discussion." *Id.* Citing *Wolston v. Reader's Digest,* 443 U.S. at 168.

Defendants have argued that comments attributed to an attorney speaking on behalf of plaintiff Joseph, Sr., when the articles first appeared in the *Citizens' Voice* warrants the determination that the plaintiffs are limited purpose public figures. The court disagrees and finds that the statements were simply limited, defensive, truthful comments that made no substantive comment on any of the matters reported in the articles. See, e.g. JTE-B.

This court concludes that none of the plaintiffs was a limited purpose public figure. While there is no dispute that the investigation in which the search warrants were executed was a public controversy, the evidence at the trial before this judge did not prove that any of the plaintiffs had access to effective channels of communication; nor that any of the plaintiffs sought to influence the resolution or outcome of the controversy; nor that any of the plaintiffs in any way voluntarily injected themself into the controversy. In their pre-trial and post-trial submissions, the defendants relied primarily on the case of *Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072 (3rd Cir. 1985) and argued that Joseph, Sr.'s long-time association with D'Elia was akin to the plaintiff/lawyer's association with the motorcycle gang clients in *Marcone.* The defendants also argued that, under the reasoning of *Mzamane v. Winfrey,* 693 F. Supp. 2d 442 (E. D. Pa. 2010), the mere association of Joseph, Sr., with a notorious alleged mobster was sufficient to make Joseph, Sr., a limited purpose public figure. This court must disagree.

This court has examined *Marcone* and *Mzamane,* considered the prevailing jurisprudence on the subject of "limited purpose public figures," and finds these cases distinguishable. *Marcone* involved a lawyer who regularly and voluntarily represented a notorious motorcycle gang and its members as clients. *Marcone,* 754 F.2d at 1075. *Marcone's* involvement with his motorcycle clients also included "non-professional" relationships where he "occasionally went on weekend trips" with one of the motorcycle gangs. *Id.* Ultimately, Marcone was also indicted, although never prosecuted, for his alleged involvement in a drug trafficking ring that involved the

motorcycle gang and, at the time, was reportedly the largest drug smuggling case in U.S. History. *Id.* at 1082. On these facts, in what was admitted to be a "close case," the Third Circuit concluded that Marcone was a limited purpose public figure. *Id.* at 1086. *Mzamane* involved the headmistress of a school founded by Oprah Winfrey in which it was alleged that students were sexually and physically abused by dorm employees (the "Dorm Parents"). The plaintiff argued that she had only a limited connection to the controversy. The District Court, however, determined that her argument "is at odds with the substance of her amended complaint and the underlying theory of her case." *Mzamane*, 693 F. Supp. 2d at 501. The court pointed out that the plaintiff described herself as having a leadership role in the OWLAG (Oprah Winfrey Leadership Academy Foundation) administration, "charged with farreaching job responsibilities" that "placed her at the forefront of the controversy." *Id.* The court observed, "Furthermore, the very theory of plaintiff's case is that because plaintiff held a leadership role in the OWLAG administration, Winfrey's somewhat ambiguous comments about the scandal would be understood by the average listener to refer to plaintiff. Thus, under plaintiff's own theory of the case, plaintiff played a 'major role' in the instant controversy." *Id.*

There is little of the facts in either the *Marcone* case or the *Mzamane* cases that resonates with the facts of this case. The evidence presented at trial showed that Joseph, Sr., had an acquaintance with William D'Elia, the reputed head of the local mafia, for nearly 30 years, principally through the interaction of his children and the D'Elia children. 2011 Tr. (TAJ) at 454:8-456:6. Joseph, Sr.'s

family and D'Elia's family became friends.[12] 2011 Tr. (TAJ) at 455:20-458:3. The evidence at trial also indicated that D'Elia secured some printing jobs for Acumark and an ill-fated organ transport service known as "Heaven Sent," that operated for a short period of time, 2011 Tr. (TAJ) at 416:19-417:22, 459:21-462:6, 726:18-728:24. D'Elia was never shown to have had any ownership interest in Acumark, 2011 Tr. (TAJ) at 416:19-417:3. D'Elia has never been an officer in Acumark, occupied an office at Acumark, or had access to any automobile provided by Acumark. *Id.* The trial evidence further indicated that, in the 1990's, Joseph, Sr., distanced himself from D'Elia. 2011 Tr. (TAJ) at 458:21-459:14. This lengthy estrangement was corroborated by Jeanne Stanton, D'Elia's girlfriend for the past "thirty-some years," who testified in February 2011 that Joseph, Sr.'s relationship with D'Elia has been "estranged" for more than "twenty years" and they have not spent time with each other socially since the 1980s. P/X 114 (Stanton 2011 Dep. Tr. At 10:20-25, 13:14-14:15, 29:2-33:12). There is no evidence in the record that the relationship between Joseph, Sr. drew any prior attention or comment, nor was any credible evidence presented at trial that Joseph, Sr. was involved in any illicit or criminal activity with D'Elia. Indeed, neither defendant Lewis, who wrote most of the articles, nor any publisher or editor working for the *Citizens' Voice* had ever heard of Joseph, Sr. or his businesses before the searches 2011 Tr. (Lewis) at 132:22; 2011. Although Joseph's house and the Acumark's business location were searched at the same time as D'Elia's house was searched, there was no credible evidence presented at trial linking the two men

---

12. The 2006 Trial Testimony was admitted in full as JTE-38

beyond being social acquaintances of varying degrees over time. Significantly, in the court's view, when D'Elia was indicted in May, 2006, the indictment contained no reference to plaintiff Joseph or to any of his businesses (P/X-71).

The defendants offer no authority for their argument that Joseph, Jr. and Airport Limousine and Taxi Service should be considered as public figures, limited or otherwise, because Airport Limousine is a publicly regulated company. There is a two-part test for determining whether an individual or a business is an all purpose public figure or a limited purpose public figure. See *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974); *McDowell v. Paiewonsky,* 769 F.2d 942, 947 (3rd Cir. V.I. 1985). The first is whether the alleged defamation involves a public controyersy, and the second is the nature and extent of the plaintiffs' involvement in that controversy. *Id.* A public controversy is a "real dispute, the outcome of which affects the general public or some segment of it." *McDowell,* supra., at 948. The status of being a publicly regulated company is not a "real-dispute." See e.g., *Brown v. Philadelphia Tribune Co.,* 668 A.2d 159 (Pa. Super. 1995) (dentist who received state reimbursement for dental work provided to lower-income patients was not a limited purpose public figure).

Aside from Joseph, Sr.'s relationship with D'Elia, the court has simultaneously considered the nature of the public "concern" or "controversy" that defendants insist requires the plaintiffs' categorization as "imited purpose public figures." In viewing the specific public controversy that defendants contend involved the plaintiffs, the evidence at trial showed only that plaintiffs, along with several others, were subjected to searches executed pursuant to warrant.

That particular incident, in which plaintiffs can hardly be described as voluntary participants, was over in a day. The evidence at trial also showed that the records seized from plaintiffs were ultimately returned in conjunction with the government requesting that plaintiff Joseph, Sr. execute a release from potential liability. 2011 Tr. (TAJ) at 477:6 - 481:2.

A few months after the searches, plaintiffs' accountant testified before the grand jury, an event which drew no comment from either the *Citizens' Voice* or the *Times Leader*. At the 2006 trial, the accountant stated (i) that he was never asked about either of plaintiff Joseph, Sr.'s airport transportation business while in the grand jury; (ii) that he didn't recognize any of the company names posed to him is companies having any dealings with Acumark; (iii) that he had never seen any documentation linking Acumark to any of these companies; and (iv) that he was never again contacted by the government after the single grand jury appearance. 2006 Tr. (Zavada) at 581:11-585:13. Parenthetically, accountant Zavada was also not asked about drugs or drug trafficking, guns or gun running, or prostitutes or prostitution. 2006 Tr. (Zavada) at 585.

No employee of Acumark or any of Joseph, Sr.'s other business was summoned before the grand jury, nor were any of the tax returns filed by Acumark, Airport Limousine and Taxi Service, Inc. (ALT), or Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc. (ATLC) ever audited by the Internal Revenue Service, *Id.*, at 560. Neither ALT nor ATLC was ever searched, and no evidence was presented at trial demonstrating that plaintiffs had any involvement with a drug ring at a local pub, or with political corruption, or with prostitution, or

with drug trafficking, or with money laundering.

Thus, based on the evidence admitted at trial, this court finds that the "public controversy" alleged by the defendants, aside from the initial searches, was largely created by defendants' own publications. In that context, this court notes the U.S. Supreme Court's caution that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proximire,* 443 U.S. 111, 135 (1979). No credible evidence was admitted at trial demonstrating that any of the "defamatory statements" published by the *Citizens' Voice* concerning plaintiffs, after reporting the initial searches of Acumark and Joseph, Sr.'s home, were true. Defendants cannot create a broader "investigation" to furnish the "public controversy" that they now claim requires plaintiffs' characterization as public figures.[13]

---

13. Defendants argued at trial that the articles did not accuse plaintiffs of crimes but simply reported on a government investigation. However, while the appearance before the grand jury of plaintiffs' accountant went unreported in the Citizens' Voice, there was no credible evidence admitted at trial that the government was conducting an investigation that embraced the elements and events that were reported in the *Citizens' Voice.* For example, there was no evidence that Joseph, Sr. had ever been sent a target letter, as clearly implied to the average reader of the *Citizens' Voice*; no evidence that Joseph, Sr. had ever been the subject of video surveillance, as clearly implied to the average reader by the *Citizens' Voice*; no evidence that plaintiffs had any connection to the local pub that was a focal point of a local drug ring; no evidence that Joseph, Sr.'s airport transportation businesses were being investigated for drug trafficking, prostitution, gun running or money laundering; no evidence that any of the plaintiffs ever were under investigation for political corruption; and no evidence that any plaintiff was in imminent danger of being indicted. When an indictment was handed down in May 2006, by the grand jury that defendants contend was conducting the investigation upon which the defendants were reporting in the articles, that indictment never mentioned the plaintiffs or any of Joseph, Sr.'s other businesses. (P/X-71)

Comparing the facts of this case to the facts in *Marcone*, and keeping in mind that *Marcone* was self-described by the Third Circuit as a "close case," and comparing the facts of this case to the facts in *Mzamane*, as well examining the nature of the "public controversy" at issue here, this court finds that the facts, taken as a whole and viewed through the eyes of a reasonable person, do not support the determination that any of the plaintiffs is a "limited purpose public figure." Accordingly, plaintiffs are not public figures, or "limited purpose public figures," required to meet the "actual malice" standard announced in *New York Times v. Sullivan.* See, e.g., *Gertz*, 418 U.S. At 351-352 (Gertz not a public figure); *Wolston v. Reader's Digest*, 443 U.S. At 166-169 (Wolston, who ignored a subpoena and refused to testify before a grand jury investigating Soviet espionage activities, was not a limited purpose public figure); *Foretich v. Capital Cities/ABC, Inc.*, 37 F. 3d at 1564 (grandparents involved in prolonged and highly publicized child custody dispute and who had repeatedly responded publicly to protest against charges that they had sexually abused their granddaughter nonetheless were private figures, not "limited purpose public figures," for the purposes of the standard of proof for a defamation claim); *Brown v. Philadelphia Tribune Co.*, 668 A.2d at 59 (dentist who received state reimbursement for dental work provided to lower-income patients was not a limited purpose public figure). To the contrary, the evidence presented at trial convinces the court that plaintiffs are "private figures" for purposes of determining the standard of proof applicable to their defamation claims.

As the U.S. Supreme Court has noted, while media are entitled to assume that public figures have voluntarily

exposed themselves to increased risk of injury from defamatory falsehood, no such assumption is justified with respect to a private individual. A private individual relinquishes no part of his interest in the protection of his own good name. *Gertz*, 418 U.S. At 345. Moreover, a legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood, *id.* at 341, and the protection of an individual's reputation is considered a fundamental value or interest protected by the Pennsylvania Constitution. *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 192, 532 A. 2d 346, 349-50 (Pa. 1987). To conclude on the facts of this case that the plaintiffs are "limited purpose public figures" would, in this Court's opinion, render meaningless the distinctions so carefully enunciated by the U.S. Supreme Court in an effort to preserve the legitimate interest a private individual has in preserving his reputation.

As private individuals and entities, the plaintiffs' burden of proof is *Negligence. Rutt v. Bethlehems' Globe Pub. Co.*, 484 A.2d 72, 83 (Pa. Super. 1984) ("a private figure defamation plaintiff, seeking compensation for harm inflicted as a result of the publication of defamatory matter, must prove that the defamatory matter was published with want of reasonable care and diligence to ascertain the truth or, in the vernacular, with negligence."); *American Future Systems, Inc. v. Better Business Bureau of Eastern Pa.*, 592 Pa. 66, 923 A.2d 389 (Pa. 2007); *Dougherty v. Bovertown Times*, 547 A.2d. 778, 787 (Pa. Super. 1988) (as a private figure plaintiff, the negligence standard is the proper standard of proof).

*(2) The Plaintiffs Have not Met their Burden Of Proof*

156

*Because None of the Plaintiffs Have Proven, with Legal Sufficiency, Either General or Special Damages or Harm by a Preponderance of the Evidence.*

a. *The Plaintiffs' Burden of Proof in a Defamation Action.*

The Uniform Single Publication Act at 42 Pa C.S.A. §8343 provides as follows:

(a) Burden of plaintiff. - In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of it as intended to be applied to the plaintiff.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) *Special harm resulting to the plaintiff from publication.*

(7) Abuse of a conditionally privileged occasion.

(Emphasis added)

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 130, 87 S.Ct. 1975 (1967), the United States Supreme Court held that, as a matter of First Amendment Constitutional law, the "actual malice" requirement of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710 (1964), would not

be extended to private individuals. The court declared that as long as the states did not impose liability without fault, they could define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. In *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S. Ct. 958 (1976), the Supreme Court expressly held that a state's decision to permit recovery for other injuries, without regard to any injury to reputation, did not violate the *Gertz* requirement that compensatory awards be supported by competent evidence concerning the injury. Thus, whether injury to reputation should be a prerequisite to recovery depends on state law, provided only that there must be evidence of actual injury, and no presumed damages, where a private person's action is based on negligence rather than "actual malice."

In Pennsylvania, each of the plaintiffs has the burden of proving "[s]pecial harm resulting to the plaintiff from (the publication of the *Citizen's Voice* articles)." 42 Pa. C.S.A. §8343(a)(6). One category of damages recoverable in defamation claims are "general damages" such as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 [(3d Cir. (Pa.) 1985)]. Harm to reputation "is judged by the reaction of other persons in the community and not by the party's self-estimation." *Rybes v. Wapner,* 457 A.2d 108, 110 (Pa.Super. 1983). In order to recover damages, each plaintiff must prove actual harm to reputation caused by the defamatory statements about them: See *Walker v. Grand Central Sanitation, Inc.,* 634 A.2d 237 (Pa.Super. 1993). The court must also consider

whether any harm to their reputation was caused by other factors. See *Bansewine v. Norristown Herald. Inc.,* 351 Pa. 634, 41 A.2d 736 (1945); see also Robert D. Sack, *Sack on Defamation; Liable. Slander & Related Problems.,* §10.5.3 (2004) ("[i]n light of the natural tendency of plaintiffs to attribute their every imaginable post publication woe to an alleged defamation, Courts have increasingly insisted the link of causation between publication and injury be clearly established.")

Another category of damages recoverable in a libel action is "special damages" which are "actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade of particular customers, or actual loss due to refusal to credit by specific persons, all expressed in figures." *Beverly Enterprises v. Trump,* 182 F.3d 183, 188 (3d Cir. 1999).

Where special damages are claimed, the plaintiffs' belief as to lost business is not enough: rather they must be proved by the testimony of third parties that the specific statements complained of caused them to withdraw their business. See generally, *Sack, supra.,* at §10.5.3. ("Where the plaintiff claims that a particular loss has resulted from actions taken by third parties on the basis of a defamatory statement, Courts have required that the plaintiff produce testimony of third parties to establish that the publication did indeed cause the loss."); *Continental Nut Co. v. Robert L. Berner Co.,* 393 F.2d 283, 286-87 (7th Cir. 1968) ("in libel action where plaintiff claimed lost profits, such damages must be proved with a specificity that shows the loss of profit attributable to patronage withheld by the particular customer and that such withholding was

the result of the publication."). In this case, none of the plaintiffs have credibly shown, with legal sufficiency, any loss caused by the articles at issue, published in the *Citizen's Voice*.

b. *Personal Claims of Thomas A. Joseph (Joseph, Sr.) for Damages*

Thomas Joseph, Sr.'s claim for general damages consisted primarily of Joseph Sr.'s testimony and the testimony of his daughter, Leah. Joseph, Sr. testified that he lost friends and his social life was impaired because of the 2001 *Citizen's Voice* articles (2006 Trial Testimony 184-185, 327, 383). Joseph, Sr. testified that the *Citizen's Voice* articles caused some of his friends to leave him. 2011 Tr. (TAJ) at 553-54. He testified although he was not a "social butterfly," and although the car accident in 1997 caused him to "curtail a lot of my social activities" he was just getting back into socializing and attending parties at the time of the articles in 2001. 2011 Tr. (TAJ) at 553-54.

Joseph, Sr. admitted, however, that in a deposition on July 11, 2001, in the middle of the time period when the articles were published by the *Citizen's Voice*, that he testified under oath that it was the accident that had caused him to cease socializing and that the accident had caused him to stop attending parties. 2011 Tr. (TAJ) at 1258; D-122 (July 11, 2001 Dep. at 85). In his accident case, Joseph, Sr. never mentioned the *Citizen's Voice* articles as the cause of his harm.

Joseph, Sr. testified that he was turned down for reservations at certain times at the Westmoreland Club, and eventually withdrew his membership there. 2011 Tr. (TAJ) at 554-55. However, the plaintiffs did not proffer

the testimony of anyone from the Westmoreland Club as to why Joseph, Sr. was allegedly not able to obtain reservations. Joseph, Sr. also acknowledged that in his July 11, 2001 deposition, he testified that he had stopped attending the Westmoreland Club because of his injuries from the accident. 2011 Tr. (TAJ) at 1258; D-122 (July 11, 2001 Dep. at 85). Moreover, the Westmoreland Club membership logs show that Joseph, Sr. continued to dine at the Westmoreland during the entire period of the articles and after. D-115. This court does not find, based upon an exhaustive review of the evidence at trial, that Joseph, Sr.'s testimony with respect to the claimed damages being caused by the publication of the *Citizen's Voice* articles to be credible or legally sufficient. [In reaching credibility conclusions, the court has applied the relevant factors set forth in Pa. Suggested Standard Jury Instructions (Civil) 1.44.] The testimony of Leah Joseph, likewise, did not credibly indicate that any claimed damage to Joseph's reputation in the community was caused by the publication of the articles in the *Citizen's Voice* and not by something else, including, but not limited to, injuries from Joseph's 1997 motor vehicle accident, its sequellae, Joseph's subsequent testimony and/or articles in the *Times Leader*.

Joseph's claim of general reputational damages is rejected by this court for several reasons. Initially, the claim is predicated on statements that are not "of and concerning" Joseph, Sr. Joseph, Sr. claims that the "real harm" to his reputation occurred to him after the August articles which stated that an airport limousine business was being investigated for transporting drugs, guns and prostitutes. The *Citizen's Voice* articles never reported that Joseph, Sr. was under investigation for these activities,

or that he was personally involved in any of this alleged activity, and Joseph, Sr. cannot properly base a claim for reputational damages on statements that do not apply to him and are not actually about him. The court also does not find credible Joseph, Sr.'s testimony that none of the true statements in the *Citizen's Voice* articles were the cause of any reputational damages to him. Joseph, Sr. provided no, or insufficient evidence, beyond his own testimony, that anyone in his community cared about his alleged ties to organized crime, his long friendship with reputed mobster D'Elia or the fact that he was being investigated by federal and state authorities for money laundering, tax evasion and illegal betting. D-344 (Joseph 4-22-2003 dep. at 199, 210, 260-61). ("Let me put it this way. If the first articles that were written the first week after the raid has stopped then, I don't think - obviously we wouldn't be sitting here, but no one - no one - the damage wasn't done then. The damage was done later on."); D-344 (Joseph 4-22-2003 Dep. at 210) ("[i]n our part of the country with all those Italians up there, its sort of like a wink and a nod, look the other way, but as far as pimps, dope dealers, people like that, I think that's offensive to anybody.") D-344 (Joseph 4-22-2003 Dep. at 260-61) (community is unconcerned about associations with reputed mob figures); D-344 (Joseph 4-22-2003 Dep. at 261) (reputation not harmed by his association with D'Elia). Secondly, the plaintiffs offered no testimony from any member of Joseph, Sr.'s community that Joseph, Sr.'s reputation was only damaged by the references to an investigation into the alleged transportation of drugs, guns and prostitutes by an airport limusine business and not by the investigation into Joseph, Sr. for alleged money lanndering and connections

to organized crime. In fact, to the contrary, witnesses who testified for Joseph, Sr., including friends and employees, testified unequivocally that nothing in the articles caused them to have a lesser view of Joseph, Sr.'s reputation, including Mary Faulkner, D-337 (Faulkner Dep. at 33-34), Frank Falzone, Joint Exhibit 38 (May 2006 T. Tr. 734), John Syzelowski (2011 T. Tr. 692). Barry Centini, manager of the Wilkes-Barre/Scranton Airport, testified that nothing in the articles affected his view of Joseph, Sr.'s reputation (2011 T.Tr. 623). Likewise, Acumark's loan account officer at FNCB, Jim Worobey, testified that the articles had no effect on his view of the reputations of Joseph, Sr. or. Joseph, Jr. (Worobey Dep. at 86). The testimony of Leah Joseph was not sufficient, nor sufficiently credible, to prove that Joseph, Sr.'s alleged loss of social enjoyment was caused by the *Citizen's Voice* articles. Neither Joseph, Sr., nor Leah Joseph, proved that the alleged loss of social enjoyment was specifically and solely attributable to the allegedly false and defamatory statements complained of in the *Citizen's Voice* articles or that it was different in kind, quantity or quality, from the loss of social enjoyment previously claimed by Joseph, Sr. in connection with his 1997 automobile accident for which he received $450,000.00. (2000 T. Tr. 1281).

c. *Thomas J. Joseph (Joseph, Jr.) did not Prove General Damages*

Likewise, Joseph, Jr. did not bear his burden of proof that the sole statement in the *Citizen's Voice* articles that was actually about him diminished his reputation in the community through any or all of his witnesses' testimony, when combined and measured against his required burden of proof.

Joseph, Jr., at trial, testified that he stopped using his last name in public about six months before the 2011 trial (2011 T. Tr. 1380), but introduced no evidence that the decision to stop using his last name, a decade after the articles were published, related to the *Citizen's Voice* articles or to the single statement in the articles about Joseph, Jr. Joseph, Jr. did not introduce the testimony of any member of his community who had a lesser or diminished view of his reputation because of the *Citizen's Voice* article. Wendy Faux, Joseph, Jr.'s fiance, testified that friends pull away when she mentions Joseph, Jr.'s name (2001 T.Tr. 1140), but she did not testify that this reaction was caused by the statements complained of in the *Citizen's Voice* published ten years ago. Accordingly, Joseph, Jr. did not meet his burden of proof of showing, by a preponderance of the evidence, that he suffered general damages in the form of a diminished reputation, solely as a result of the single statement about him in the *Citizen's Voice* articles.

d. *Acumark and Airport Limousine Failed to Prove their Claims for General or Special Damages by a Preponderance of the Evidence.*

i. *Neither Acumark nor Airport Limousine Produced any Testimony or other Specific Evidence Concerning any Impact on Acumark or Airport Limousine's Reputation in the Community as a Result of the* Citizen's Voice *Articles.*

Not a single third party testified that Acumark or Airport Limousine had a diminished reputation attributable to the statements "of and concerning" those plaintiffs in the *Citizen's Voice* newspaper. In fact, no evidence at all was presented from any third party concerning Acumark's and

Airport Limousine's reputation in the community. The only witness who testified concerning Airport Limousine was Joseph, Sr. who acknowledged, in a verified statement, D-103, that he advised the PUC that Airport Limousine "has remained in business and has provided service to the public notwithstanding the devastating economic effect which 9/11 had on the transportation industry nationally and also the local impact which resulted in a severe reduction in passengers traveling from the airport. In addition, US Airways, which formerly was Airport Limo's biggest customer, went bankrupt, leaving an account payable of $18,000 which has not and probably will not be paid. Also, US Airways, while still serving the airport, has eliminated all jet service, which it replaced with smaller jet-prop equipment." (2011 T. Tr. 245) At no time, did Joseph, Sr. ever tell the PUC that Airport Limousine had been impacted by the *Citizen's Voice* articles. (2011 T.Tr. 1246) When Joseph, Sr. was trying to secure financial assistance for his daughter, Leah, to attend Georgetown, he wrote Mr. Worobey of FNCB on March 27, 2003, D-72, advising Worobey that profits at Acumark had been down due to "overcapacity and reduced demand" in the printing industry, and Joseph, Sr. expected a profit soon because Acumark had shifted to digital printing (2011 T. Tr. 1201) At no point in time, however, after the publishing of the *Citizen's Voice* articles, did Joseph, Sr. ever publicly blame the *Citizen's Voice* articles for any negative impact on his businesses, Acumark, Airport Limousine and Airport Taxi. The one and only time that Joseph, Sr. has ever blamed the articles for harming his businesses was within the context of this litigation, and at least for the purpose of this litigation, he blames all his problems on the *Citizen's Voice* articles.

(2011 T.Tr. 523) (articles caused "total devastation" to Acumark"); (2011 T.Tr. 543) (the articles "killed it dead" in reference to Airport Limousine). Neither Acumark nor Airport Limousine introduced any evidence to show that its reputation was impacted solely by the later *Citizen's Voice* articles, and not the first two articles showing Acumark was the subject of a federal raid which resulted in the seizure of its business records, including a picture of agents carting off Acumark records and Joint Exhibit B, or any of the *Times Leader* articles that discussed the raid of Acumark and also showed pictures of the business as being part of a raid that was linked to organized crime, Joint Exhibits 32 thru 37, or the later *Times Leader* article that linked Acumark with money laundering. D-9. To the contrary, Joseph, Sr. admitted that the *Times Leader* articles were harmful to Acumark's reputation. (2011 T.Tr. 772) (reporting by *Times Leader* in Joint Exhibit 34: "I viewed it more in terms of harmful to my business."); (2011 T.Tr. 779) (reporting by *Times Leader* in Joint Exhibit 36: "My concern at the time was my business"). Joseph, Jr. also admitted that the *Times Leader* articles did not help Acumark's reputation. (2011 T.Tr. 1409, 1422)

ii. *Airport Limousine has no Separate Claim for Special Damages.*

Airport Limousine did not make a separate claim for special damages. Airport Limousine's claim for special damages was incorporated into and made a part of Acumark's claim for special damages. The plaintiffs' expert, Mr. Verzilli, gave an opinion only as to Acumark's alleged damages, but his calculations were based upon revenue figures that included the revenues of Airport Limousine (2011 T.Tr. 1513). This was apparently

because Airport Limousine's revenues were reported as part of Acumark's revenues (2011 T.Tr. 421-422). Even though it was apparently possible to separate out Airport Limousine's revenues based upon the financial records produced by the plaintiffs (2011 T.Tr.1514), the plaintiffs did not do so. The only expert testimony produced at trial as to special damages was for Acumark. Joseph, Sr. testified that "publicity" caused the airport authority to transition Airport Limousine's contract with the airport to a month-to-month basis. Airport Limousine did not produce evidence that the "publicity" was caused by the allegedly defamatory statements in the *Citizen's Voice* articles or that the alleged damages were caused by the non-defamatory articles, Joint Exhibits A and B, the true statements contained in the later articles, or any of the articles published in the *Times Leader*. Airport Limousine failed to credibly prove any quantifiable harm associated with a month-to-month contract, either through Joseph, Sr., Joseph, Jr., or Mr. Verzilli.

### iii. *Acumark Failed to Prove Special Damages.*

Acumark claimed special damages for lost revenue, D-344 (Acumark 7-30-2003 dep. at 364-65) ("our claim is we suffered a huge drop in revenue"), and at trial, Joseph, Sr. testified that "[r]evenue is what matters to me." (2011 T.Tr. 406-07).

Under Pennsylvania law, the "general rule applicable for loss of profits [revenue in this case] in both contract and tort actions allows such damages where (1) there is evidence to establish them with reasonable certainty, [and] (2) there is evidence to show they were the proximate consequence of the wrong…" *Company Image Knitware,*

*Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 336 (Pa.Super. 2006); *Delahanty v. First Pa. Bank*, N.A., 464 A.2d 1243, 1258 (Pa.Super. 1983). Damages need not be determined with mathematical precision, but must be shown with a reasonable degree of certainty. See e.g., *Delahanty*, supra. The plaintiff, Acumark, had the burden of proving its claim for damages by a preponderance of the evidence. Acumark failed to prove the amount of its alleged lost revenue with a reasonable degree of certainty and did not prove that the alleged lost revenue was proximately caused by the alleged defamatory statements in the *Citizen's Voice* articles. Initially, Acumark's financial records show that Acumark's revenues increased from $1.4 million in 2001, to $1.41 million in 2002 and to $1.51 million in 2003. D-314; D-315. Acumark presented the testimony of Andrew Verzilli who testified that Acumark's revenues would have been even higher if it had performed at its ideal "potential." The opinion that Verzilli ultimately offered was that Acumark had the potential to earn between $2.0 million and $2.9 million more than it actually did between 2001 and 2009, and for some reason or reasons it did not. In order to do this, Verzilli started with a snapshot of Acumark's historical performance in 2000 and applied a 5 percent to 10 percent growth rate to this base year figure between 2001 and 2006, and a fiat growth rate after 2006. He only measured the difference between Acumark's actual revenue and the revenue, assuming this potential growth, to reach a difference in revenue for each year and, then, applied a 70 percent reduction to account for costs, to reach a "net" profit for Acumark. Verzilli did not take into account any other factors that may have impacted potential growth, including the impact of 9/11; two recessions in

the 2001 to 2009 time period; the fact that Offset Printing was a declining business model process which required Acumark to completely retool its printing business (2011 T. Tr. 529); the impact of the US Airways bankruptcy (2011 T. Tr. 881); the fact that Do-Not-Call legislation wiped out Acumark's call center business (2011 T. Tr. 882), which constituted 30 to 35 percent of Acumark's business (2011 T.T r. 1173); or the disabling impact of the auto accident on Joseph, Sr.'s personal ability to generate new business (2011 T.Tr. 887). *Verzilli admitted he did not offer an opinion on causation at all* (2011 T.Tr. 848). Verzilli offered no opinion as to what the cause(s) were for Acumark's alleged inability to perform to its "potential" from 2001 to 2009 (2011 T. Tr. 848; 863) ("I am not giving an opinion on causation"); (878: "I did not make an analysis as to causation"). In fact, the plaintiffs did not offer any competent evidence to show any of the alleged lost profits [revenues] were proximately caused by the *Citizen's Voice* articles. See *Company Image Knitware*, supra., 909 A.2d at 336-37, upholding the trial court's finding that there was "no evidence to show that lost profits were the proximate consequence of [defendant's] breach."). Speculation by the fact-finder is not a legally sufficient substitute for the plaintiff's failure to provide evidence on causation. See, e.g., *Marion Spring Co. v. Muelles HNOS. Garcia Torres S.A.*, 462 A.2d 686, 695 (Pa.Super. 1983) ("damages for lost profits...may not be awarded when the evidence leaves the trier of fact without any guide posts except his or her own speculation."). While it may be impossible to predict future business performance with total accuracy in a case such as this, an expert appraisal of probabilities should be based on specific facts and data. In this case,

Mr. Verzilli's opinions did not include any opinion as to and did not assist this court in determining what part of Acumark's claimed "loss potential" could be attributed to the allegedly defamatory statements in the *Citizen's Voice* articles in 2001 individually and/or as opposed to what could be attributed to the other negative business events and conditions that occurred between 2001 and 2009. Moreover, Mr. Verzilli's opinion about Acumark's "potential" did not provide a sufficient basis for this court to determine if the claimed "potential" would or could ever have been realized. A "window of possibility" is not a reasonably certain basis for calculating damages. Moreover, instead of doing a "customer analysis" based on verified and/or verifiable customer performance data, Verzilli, in formulating his opinion, uncritically relied on a melange of sometimes fragmentary information Joseph, Sr. provided to him as to what the data constituted, where Joseph, Sr. believed his company was heading and on 2004 forecasts predicting how a number of selected industries would perform between 2004 and 2005. (2011 T.Tr. 870-71; P-35) After a review of the evidence and an observation of the witnesses, there is an insufficient basis for uncritical reliance on Joseph, Sr.'s representations. Joseph, Sr., in the litigation for his claimed injuries resulting from his 1997 automobile accident, attributed Acumark's growth or lack of growth after 1998 primarily to that automobile accident. D-122 (July 2001 dep. at 40-41). While plaintiffs claim that the articles linking plaintiffs to guns, drugs, and prostitutes, led to the loss of several of Joseph Sr.'s customers, including Adelphia Cable, North Penn Savings & Loan, CEO People Helping People, the University of Scranton, St. Ann's Media, Catholic Golden Age Charities,

and Luzerne County Courthouse, the plaintiffs did not offer testimony from any of these customers indicating that they withdrew or transferred their business because of the *Citizen's Voice* articles, nor was Mr. Verzilli provided with documentation indicating that these customers withdrew their business because of the *Citizen's Voice* articles. The defense expert, Mark Gleason, provided testimony and documentation which analyzed the actual customer data and determined that the business from these customers actually increased significantly in the three years after the publication of the *Citizen's Voice* articles. (D-307; D-321.)

Joseph Sr. and Joseph Jr. testified that Acumark and Airport Limousine lost local customers as a result of the publicity associated with the *Citizen's Voice* articles. However, Acumark's financial documents reflect that 80 percent of Acumark's revenue after the *Citizen's Voice* articles remained local in nature. (D-308.) Moreover, Joseph, Sr.'s claim that the articles caused him to lose lucrative local business was completely at odds with his testimony, as part of his accident case, that he was forced to give up foreign and national accounts, and instead take on less profitable local business. (D-323.)

The plaintiffs also claimed that they lost significant political customer accounts. Other than their own testimony stating that Acumark had significant political business in May 2001 and then no political business in November 2001, no documents were introduced to substantiate this claim and no specific account or customer was either credibly (1) identified or (2) testified.

iv. *Punitive Damages*

Each of the plaintiffs asserted a claim for punitive damages.

Punitive damages are a form of relief that does not stand as a separate cause of action. *Mansman v. Tuman,* 970 F. Supp. 389 (E.D. PA 1997) (applying Pennsylvania law); *Brennan v. National Telephone Directory Corp.,* 850 F. Supp. 331 (E.D. PA 1994) (applying Pennsylvania law). Punitive damages cannot be recovered in the absence of a legally recognized injury (*Houston v. Texaco, Inc.,* 538 A.2d 502 (Pa. Super. 1988)), where the underlying cause asserted is not proved, or is dismissed (*Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800 (Pa. 1989); *Houston v. Texaco, Inc.,* supra.), where the plaintiff cannot establish a right to recover from the defendant despite his or her wrongful conduct because, for example, the plaintiff has already been fully compensated by a joint tortfeasor. (*Hilbert v. Roth,* 395 Pa. 270, 149 A.2d 648 (Pa. 1959)). In this case, 42 Pa. C.S.A. §8343(6) requires the plaintiffs, as part of their burden of proof, to show general damages or special damages resulting to them from the publication of the *Citizen's Voice* articles. Since the plaintiffs did not meet their burden of proof of showing any harm caused to them by the publication of the *Citizen's Voice* articles, they are, by legal definition, not entitled to any punitive damages.

B. Plaintiffs Joseph, Sr. and Joseph, Jr. have failed to meet their burden of proof as to their false light/invasion of privacy claims because neither has proven either general or special damages by a preponderance of the evidence.

A cause of action for invasion of privacy in Pennsylvania is comprised of four analytically district torts, one of which

is "publicity placing a person in a false light." *Larsen v. Philadelphia Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. 1988). To make a claim for false light invasion of privacy, the plaintiff must show that a highly offensive false statement was publicized by defendants with actual malice, that is, knowledge or reckless disregard of the falsity or the false light into which the plaintiff was placed. See *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1974); *Santillo v. Reedel*, 634 A.2d 264, 267 (Pa. Super. 1993); Restatement (Second) of Torts §652E (1977). In addition, false light can be found where true, factual statements are presented in a way intended to imply falsehoods or to create a false impression. *UHL v. CBS, Inc.*, 476 F.Supp. 1134, 1140 (W. D. Pa. 1979) (film of plaintiff hunter spliced to make him look unsportsmanlike is actionable as a false light claim).

Once a plaintiff establishes a cause of action (for the tort of invasion of privacy), he or she may recover damages for:

(a) the harm to his interest in privacy resulting from the invasion;

(b) his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; and

(c) special damage of which the invasion is a legal cause. Restatement (Second) of Torts §625H; *Wecht v. PG Publishing Co.*, 725 A.2d 788 (Pa. Super. 1999).

It is axiomatic that, in order to recover damages, the plaintiffs must prove by a preponderance of the evidence that they have incurred damages. As this opinion has

addressed at length [A. (2), supra.], the plaintiffs, Joseph, Sr. and Joseph, Jr. have failed to prove that any damages were caused to them by the *Citizens' Voice* articles.

Accordingly, and for the reasons set forth above, the court enters the Verdict attached hereto.

## VERDICT

And now, December 8, 2011, a verdict is hereby entered in favor of the defendants and against the plaintiffs on all claims at issue in this matter.

The prothonotary is directed to file and serve notice of the entry of this order and attached opinion pursuant to Pa. R.C.P. 236.